STANLEY CLARK, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (1st Division)   No. 1—98—2304

Opinion filed March 27, 2000.—Rehearing denied May 5, 2000.

James R. Potter, of Kinoy, Taren, Geraghty & Potter, P.C., of Chicago, for petitioner.

James E. Ryan, Attorney General, of Chicago (Erik G. Light, Assistant Attorney General, of counsel), for respondents.

JUSTICE TULLY delivered the opinion of the court:

Petitioner, Stanley Clark, brought suit against respondent law firm, Rodriguez & Villalobos, alleging discrimination based on age and national origin in employment in violation of the Illinois Human Rights Act[1] (Act) (775 ILCS 5/1—101 *et seq.* (West 1996)). An administrative law judge (ALJ) concluded that Clark provided sufficient evidence to sustain his claim and recommended an award in Clark's favor. The Illinois Human Rights Commission (Commission) reversed the ALJ's recommended decision and dismissed the complaint with prejudice. Clark now appeals pursuant to section 8—111 of the Human Rights Act (the Act) (775 ILCS 5/8—111 (West 1996)) and Supreme Court Rule 335 (155 Ill. 2d R. 335).

The central issue raised on appeal is whether the Commission's finding, that respondent's articulated reason for discharging Clark was not a pretext for discrimination, is against the manifest weight of the evidence. We answer this question in the negative and accordingly affirm the judgment of the Commission.

Rodriguez & Villalobos (the firm) was formed by the named partners in 1986 with assistance of Chicago United, a group of Fortune 500 corporations seeking to do business with a qualified minority law firm. In order to qualify as a minority-owned enterprise, a business must comply with the requirements of the Business Enterprise for Minorities, Females, and Persons with Disabilities Act (Business Act) (30 ILCS 575/1 *et seq.* (West 1996)) and be "at least 51% owned by one or more minority persons *** and the management and daily business operations [must be] controlled by one or more of the minority individuals who own it." 30 ILCS 575/2(A)(3) (West 1996). The stated purpose of the Business Act is to "promote and encourage the continuing economic development of minority and female owned and operated businesses and that minority and female owned and operated businesses participate in the State's procurement process as both prime and subcontractors." 30 ILCS 575/1 (West 1996). The Business Act specifically includes Hispanic individuals in its definition of "minority." 30 ILCS 575/2(A)(1)(b) (West 1996).

---

[1]The Human Rights Act (775 ILCS 5/1—101 *et seq.* (West 1996)) guarantees freedom from discrimination in employment. Section 1—103 of the Act defines unlawful discrimination as "discrimination against a person because of his or her race, color, religion, national origin, ancestry, [or] age." 775 ILCS 5/1—103(Q) (West 1996). Pursuant to the Act, persons over 40 years of age are included in the protected class. 735 ILCS 5/1—103(A) (West 1996).

Clark joined the firm as an associate in 1988, after serving 15 years as a senior partner at Epton, Mullen & Drüth. At the time of his hire, he was 58 years of age and his starting salary was $60,000 per year. Clark's national origins are American, German, English and Scottish. During his tenure at the firm, Clark worked on cases submitted by some of the firm's major clients, including the Chicago Housing Authority (CHA), the Chicago Board of Education and Allstate Insurance Company.

Clark was terminated on April 12, 1991. At the time of his discharge, the firm was comprised of 12 attorneys; 5 were Hispanic and 7 were non-Hispanic. Eight of the twelve attorneys were over 40 years of age. He was not replaced and his work was distributed amongst six remaining attorneys.

At the hearing, Clark elicited testimony from former coworkers indicative of a general discriminatory animus prevalent at the firm. Jeffrey Trevino, a former associate at the firm, testified he had a conversation with one of the firm's senior attorneys, John Goudge (Welsh and German; mid-40s), in the fall of 1989 wherein Goudge stated that the firm's letterhead purposefully omitted the non-Hispanic attorneys' names. Because the firm represented itself as a minority law firm, its status as such might be compromised if non-Hispanic names appeared on the letterhead. Goudge further expressed the firm desired to hire more young attorneys who would be willing to work for less money than the older, more experienced attorneys. Trevino resigned from the firm in August 1990.

Stanley Horn, a former affiliate, testified he had much the same conversation with Ray Rodriguez as Trevino recounted having with Goudge. Horn testified that the firm stationary omitted a mast head, a listing of associates working within the firm, because Rodriguez believed the inclusion of non-Hispanic names would impact the firm's identity as Hispanic. Furthermore, although it was his understanding he had achieved partnership status with the firm, his own name was never placed on the letterhead. Horn also testified that Rodriguez and Villalobos each remarked, at different times, that Clark was paid too much money and the firm wished to employ more Hispanic attorneys. On cross-examination, Horn recalled the firm received a complaint regarding Clark's billing practices during the summer of 1990, but he could not recall the details of that complaint. Horn separated from the firm in September 1990 and subsequently initiated litigation challenging the firm's disavowal of Horn's partnership status with the firm. At the time Horn rendered this testimony, he acknowledged his relationship with both named partners was contentious and an appeal surrounding the aforementioned litigation was pending.

Raul Villasuso, Jr., a former law clerk with the firm, recalled a conversation with Goudge wherein Goudge told Villasuso he wanted Hispanic personnel working on the Chicago Board of Education business because it had been obtained as a result of the firm's minority enterprise business status. Goudge also told Villasuso he "fit the mold" for the type of employee the firm wanted working on those files. Villasuso testified he did not have any knowledge about complaints about Clark's billing practices. Villasuso was never employed by the firm in an attorney capacity. He is currently a partner at Horn & Villasuso.

Clark testified he was hired by the firm as a salaried associate with the promise of a partnership in the future. He stated he was never advised by Rodriguez there were complaints about his billing practices nor was he informed monetary adjustments had been made on past billings. He further testified he had no inkling he was going to be fired. He was completely stunned at what appeared to him a sudden turn of events.

Respondent presented evidence in support of its contention that Clark was discharged because his billing practices had generated numerous complaints with its clients.

Ray Rodriguez recalled specific complaints regarding Clark's billing practices. He stated that, in July 1989, the firm received a complaint from the CHA liaison disputing charges for telephone calls allegedly made by Clark and billed to the CHA over a period of eight months. The firm ultimately refunded $1,380 to the CHA. Both Rodriguez and Villalobos discussed this complaint with Clark and instituted a review of Clark's billings before they were sent to the clients.

Again, in August or September 1989, the firm received a complaint letter from CHA that characterized Clark's billable hours as impossible and unrealistic. Rodriguez testified he again met with Clark to discuss the billing problems.

Villalobos also testified regarding Clark's billing practices. He recalled having received two complaints from insurance adjusters at Allstate in the summer of 1990. The first complaint alleged Clark had submitted a bill reflecting settlement negotiations with opposing counsel. However, that file had been settled by Villalobos himself and closed for approximately six months. Clark had not ever been assigned to work on the file. Then in August, a second complaint alleged Clark submitted a bill for a witness not mentioned in the file. Villalobos reviewed the file himself and verified no such witness existed.

In October 1990, the firm received a third complaint from Allstate that alleged Clark had billed for a telephone conversation with the adjuster that never took place. Villalobos testified the firm lost the Allstate account due to its continued dissatisfaction with the discrepancies in Clark's billings.

In February 1991, the CHA liaison requested an explanation of certain charges billed by Clark. Rodriguez and Villalobos met with Clark to discuss the new complaint. Although the CHA liaison requested Clark be removed from working on CHA files sometime in 1989 or 1990, the record reveals he continued working on CHA files until the time of his discharge.

On April 12, 1991, Rodriguez and Villalobos terminated Clark's employment with the firm. The partners told Clark he had alienated two major clients, Allstate and the CHA, and that the firm had lost Allstate as a client because of Clark's questionable billings. Nevertheless, Rodriguez and Villalobos agreed to allow Clark to finish up some work while he sought alternative employment.

That weekend, Rodriguez and Goudge looked through the papers and files in Clark's office. They discovered billings for closed cases and a phantom deposition scheduled for the upcoming week. After making this discovery, the partners agreed Clark's termination would be effective immediately. Clark filed his complaint with the Human Rights Commission alleging his discharge was based upon his national origins and his age.

After conducting a hearing, the ALJ concluded Clark had produced sufficient evidence to support his claim and recommended the firm reinstate Clark and pay him $133,105 for lost wages, $12,400 for medical insurance premiums, and $46,630 for attorney fees.

The Commission reversed and refused to adopt the recommended order and decision concluding the ALJ's factual findings of discrimination against plaintiff were against the manifest weight of the evidence.

## ANALYSIS

The questions before this court are whether the Commission improperly considered the stated purpose of the Business Act as a factor mitigating against the discriminatory nature of respondent's conduct and whether the Commission's decision is against the manifest weight of the evidence.

■ Upon reviewing a decision of the Illinois Human Rights Commission, this court must uphold that decision unless it is based on facts that are contrary to the manifest weight of the evidence. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989); 735 ILCS 5/3—110 (West 1996). An agency's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76 (1992). A reviewing court is not justified in reversing a finding made by an agency if it finds that the opposite conclusion is reasonable or it might have ruled differently. *Abrahamson*, 153 Ill. 2d 76.

■ With regard to the factual findings of an administrative agency, all findings are deemed *prima facie* true and correct. "Findings of fact are entitled to [great] deference, and this is particularly true of credibility determinations." *Zaderaka*, 131 Ill. 2d at 180. However, we do not pass upon the propriety of the Commission's determination that the findings of the ALJ were contrary to the manifest weight of the evidence. Rather, we review the determination of the Commission as if that body were the original fact finder. *Habinka v. Human Rights Comm'n*, 192 Ill. App. 3d 343, 371 (1989).

■ Employment discrimination claims brought under the Act are analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), which was adopted by our supreme court in *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172 (1989). First, a plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that the employer intentionally discriminated against the plaintiff. *Zaderaka*, 131 Ill. 2d at 178-79.

"[T]o rebut the presumption, the employer must articulate, not prove [citation], a legitimate, nondiscriminatory reason for its decision." *Zaderaka*, 131 Ill. 2d at 179. Once the employer articulates a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the reason was a pretext for unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 179. "[T]he complainant must show that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Interstate Material Corp. v. Human Rights Comm'n*, 274 Ill. App. 3d 1014, 1022 (1995).

■ In the instant case, the Commission concluded that plaintiff set forth sufficient facts to make a *prima facie* case of national origin and age discrimination. "As to direct evidence raising an inference of intentional discrimination, when a prejudice against a protected class is established to exist in the mind of a decision-maker *** and a decision is consistent with that prejudice, the fact finder initially must presume that the decision was in fact motivated by that prejudice." *Lalvani*, Ill. Hum. Rts. Comm'n Rep. 1990CA2502 (March 3, 1997). The Commission determined the direct evidence presented did not prove conclusively that the firm discriminated against Clark but raised an inference of discrimination that would require respondent to articulate a legitimate reason for its action.

In rebuttal, respondent presented evidence to show plaintiff was discharged due to the deleterious effects of his billing practices. Both partners testified plaintiff's billing practices were the subject of

complaints from three separate clients, one of which terminated the firm's services. The record indicates that six separate complaints regarding Clark's billing practices were lodged with the firm in a period of less than two years and that plaintiff continued the same course of conduct despite the partners' admonishments.

In surrebuttal, petitioner contends respondent's articulated reasons for discharging him were pretextual. Plaintiff first argues the proffered reason is not worthy of credence because the complaints about plaintiff's billings were minor, had been treated as minor incidents, and the dollar amounts in dispute were negligible compared to plaintiff's total billable hours. Moreover, plaintiff maintains if questionable billings were the true impetus for his discharge, the firm would have acted contemporaneously with the clients' complaints. Thus, client complaints about plaintiff's billings could not possibly be the real reason for his termination. However, the Commission rejected this characterization of the evidence, instead finding plaintiff engaged in deliberate fraud and misrepresentation with respect to his files. As to the time lag between the firm's receipt of the complaints and plaintiff's discharge, the Commission determined the firm more likely delayed plaintiff's termination because he was generating significant revenues for the firm. Petitioner was retained until his misconduct had become too costly and his presence too troublesome.

We agree with the conclusion of the Commission in this regard. Whether an employer's articulated reason is pretextual is a question of fact. *Zaderaka*, 131 Ill. 2d at 180. Findings of fact are entitled to deference, and we cannot say this conclusion is against the manifest weight of the evidence.

Petitioner also contends respondent's expressed preference for younger, Hispanic attorneys was more likely the motivation for his discharge than the billing discrepancies. First, the Commission acknowledges the inherent weakness in this argument by noting petitioner was hired as a 58-year-old non-Hispanic, by a minority-owned law firm and discharged within three years. If the firm, in fact, harbored such preferences, why was petitioner initially hired? Additionally, at the time of petitioner's dismissal, the firm workforce was composed of 12 attorneys; 7 were non-Hispanic and 8 were over the age of 40. These factors undermine petitioner's claim of pretext. In light of plaintiff's serious and recurring misconduct and the resulting impact on the firm's relationships with its clients, we believe the Commission had a reasonable basis to conclude misconduct was more likely the reason for plaintiff's discharge than discrimination.

Because we affirm the conclusion of the Commission as being in accord with the manifest weight of the evidence, we need not address

a second issue raised by plaintiff, whether the Commission improperly construed the Business Act.

In light of the foregoing, the judgment of the Commission is affirmed.

Affirmed.

O'MARA FROSSARD, P.J., and GALLAGHER, J., concur.