NO. 4-06-0445          Filed 8/22/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| THE SANGAMON COUNTY SHERIFF'S DEPARTMENT,      Petitioner-Appellant,      v. THE STATE OF ILLINOIS HUMAN RIGHTS COMMISSION; DONNA FELECCIA, and RON YANOR,      Respondents-Appellees. | ) Direct Administrative ) Review of the ) Illinois Human Rights ) Commission ) No. 1999SF0713 ) ) ) ) |

_____

JUSTICE KNECHT delivered the opinion of the court:

Petitioner, the Sangamon County Sheriff's Department (Sheriff's Department), appeals an order of the Illinois Human Rights Commission (Commission), finding the Sheriff's Department strictly liable for respondent Ron Yanor's sexual harassment of respondent Donna Feleccia.  We reverse.

I. BACKGROUND

On June 15, 1999, respondent Donna Feleccia filed a charge of discrimination with the Illinois Department of Human Rights (Department of Human Rights) alleging she had been sexually harassed.  On August 19, 1999, Feleccia filed an amended charge alleging (1) sexual harassment on or about February 1, 1999, with a retaliatory motivation; (2) sexual harassment on or about February 1, 1999, that "created a hostile, embarrassing, and intimidating work environment"; and (3) "[d]ifferent terms

and conditions continuing to August 18, 1999, because of retaliation," which occurred at such a time to raise the inference of retaliatory motivation. Feleccia named petitioner Sheriff's Department and respondent Ron Yanor as respondents in the amended charge of discrimination.

On July 18, 2000, the Commission filed a four-count complaint against the Sheriff's Department and Yanor. Count I alleged that the Sheriff's Department was an "employer" within the meaning of section 2-101(B)(1)(b) of the Illinois Human Rights Act (Act) (775 ILCS 5/2-101(B)(1)(b) (West 2000)) and Yanor was an "employee" within the meaning of section 2-101(A) of the Act (775 ILCS 5/2-101(A) (West 2000)). Count I further alleged Feleccia was "aggrieved by practices of retaliation and sexual harassment discrimination prohibited by [s]ections 6-101(A) and 2-102(D) of the Act." Specifically, count I alleged that (1) in December 1998, Feleccia opposed sexual harassment by declining Yanor's request to have sex with him; (2) that on February 1, 1999, Yanor wrote a ficticious letter addressed to Feleccia that stated she may have been exposed to a communicable or sexually transmitted disease; and (3) the Sheriff's Department harassed Feleccia in retaliation for opposing sexual harassment, in violation of section 6-101(A) of the Act. Count II adopted the same allegations as count I but was directed at Yanor.

Counts III and IV realleged the allegations in count I

- 2 -

and alleged Yanor sexually harassed Feleccia by engaging in the following acts: (1) kissing her on November 19, 1998; (2) delivering a coffee cup with candy in it to Feleccia's home in December 1998; (3) asking her if she wanted to have sex with him in December 1998; and (4) sending Feleccia a ficticious letter that stated she may have been exposed to a communicable or sexually transmitted disease. Moreover, counts III and IV alleged the conduct created a hostile, intimidating, and offensive work environment. Those counts further alleged the Sheriff's Department and Yanor sexually harassed Feleccia in violation of section 2-102(D) of the Act and that the Sheriff's Department was strictly liable for Yanor's actions because Yanor was a member of management.

On November 13, 2000, the Sheriff's Department filed its verified answer. The Sheriff's Department denied it sexually harassed plaintiff and also denied strict liability should be imposed. Additionally, the Sheriff's Department set forth the following two affirmative defenses: (1) Feleccia failed to use the complaint procedure, i.e., the Sheriff's Department had a policy against sexual harassment in place at all relevant times and Feleccia did not initially report any of the first three incidents alleged in counts III and IV all of which occurred outside the workplace or were without witness, and (2) the Sheriff's Department took prompt remedial action, i.e., the

- 3 -

Sheriff's Department launched an extensive investigation and took prompt remedial action against Yanor after learning he authored the ficticious letter. Feleccia and Yanor settled; however the case against the Sheriff's Department continued.

The record reveals the following. Feleccia, now known as Donna Scroggin, has worked at the Sheriff's Department since 1992. Feleccia is a clerk in the records department, and in 1998 and 1999, her job was to enter data on warrants and orders of protection into the computer system. Lieutenant Sandra Hinsey, the highest ranking individual in the records department, was Feleccia's supervisor.

Feleccia met Yanor in 1992. Feleccia testified at the hearing before the administrative law judge (ALJ) that Yanor first sexually harassed her in November 1998 when he called her to go to Chantilly Lace, a local bar, after the annual "cigar dinner" the sheriff holds each year. Yanor allegedly stated a group of people were going to Chantilly Lace. Feleccia agreed to go because "we were friends" and she mistakenly thought Yanor's wife would be with him. Yanor picked her up and when they got to the bar no one else Feleccia knew was there. Only one other person Feleccia knew showed up, and Feleccia became uncomfortable and asked Yanor to take her home. Yanor agreed to take her home. When Feleccia tried to get out of the car, Yanor grabbed her arm

and asked for a kiss. Feleccia responded "no, you're married." Yanor asked again and would not let go of her arm. Feleccia told Yanor "we're just friends." Again, Yanor would not let go of her arm, so she gave him a kiss and she then went up to her house. Feleccia stated the next time Yanor harassed her was in December 1998, when Yanor showed up to her house with a Christmas cup with candies in it. Feleccia's children answered the door and let him in. Yanor was on duty at the time.

The next incident occurred at Feleccia's friend MerriEllen King's December 1998 office Christmas party held at Chantilly Lace. Yanor was at the bar and Feleccia just said "hi" to him. Both Feleccia and King testified that Yanor glared at Feleccia while they danced. Eventually Yanor asked Feleccia if she wanted to dance with him, to which she responded "no." According to King, she and Feleccia left because Feleccia felt uncomfortable. Later, Feleccia told King that Yanor had been stopping by her desk at work and asking her to go out with him. According to Feleccia, the next incident, also in December 1998, occurred when Yanor stopped by her desk when she was by herself and asked if she "would like to go to a motel with him for the night." Feleccia said "no" and told him "[w]e will always just be friends" and "you're married. I've always told you just friends."

On February 5, 1999, Feleccia received a envelope on

her desk.  The envelope contained a letter, dated January 29, 1999, which stated the following:

> "This is to inform you that you may have recently been exposed to a communicable or sexually transmitted disease.  A confidential source who has tested positive has brought this matter to our attention.
>
> To insure your privacy, your file has been assigned a control number of #A23759.  Please refer to this in future correspondence.
>
> It is important that you schedule a screening within the next 7 days.  Please contact your local public health office for an appointment.  This service is provided at no cost to you."

The letter appeared to be on Illinois Department of Public Health letterhead.

Feleccia "read it, and *** started shaking.  And [she] didn't want anybody to see [her] cry, so [she] went to *** Lieutenant [Hinsey]" and handed her the letter.  As stated, Hinsey was Feleccia's supervisor.  She was also one of two individuals in the office whom employees were to go to for complaints of sexual harassment.

Hinsey and Feleccia left the office and took the letter to the Department of Public Health, where they learned the letter did not come from there. On their way back to their office, Hinsey asked Feleccia if it could have been Deputy Dale Newsome or Yanor who wrote the letter. Feleccia did not think it was either of them. Feleccia mentioned no previous history with Yanor other than joking around at the office. Upon returning to the office, they showed the letter to Chief Tony Sacco, who said there would be an investigation. Hinsey told Feleccia to act normal and not say anything about the matter until the investigation was completed. Following an investigation by internal affairs, it was determined that Yanor was the author of the letter. Yanor later admitted writing the letter but claimed it was a practical joke. Sergeant Stephen Meyer, who conducted the investigation for the Sheriff's Department, informed Sheriff Neil Williamson of his conclusion that the complaint of sexual harassment had been substantiated. Nobody discussed the letter with Feleccia between February 5, 1999, the day she received the letter, and May 25, 1999, the day she was informed the author of the letter had been identified.

After learning the identity of the author of the letter had been discovered, Feleccia went to Sergeant Meyer to find out who it was. He informed her that it was Yanor. When asked by Feleccia what kind of discipline Yanor received, Meyer told

Feleccia she would have to go to Sheriff Williamson.  Feleccia went to Sheriff Williamson, who informed her that "he gave him as many days as he could without the merit board finding out."  On May 18, 1999, Sheriff Williamson had informed Yanor that he was suspended for four days without pay to be served consecutively by June 11, 1999.  Williamson had also talked to the Department of Public Health.  Feleccia perceived that Sheriff Williamson talked to the Department of Public Health so that it would not press charges.  However, the Department of Public Health did refer the matter to the Sangamon County State's Attorney's office for possible prosecution, but no prosecution ever occurred.  According to Feleccia, Williamson also told her not to go to the media, bring sexual-harassment charges, or to go anywhere near Yanor or talk to him.  After the meeting with Williamson, Lieutenant Hinsey and Feleccia went back to the office, where Feleccia informed Hinsey she was not happy with the discipline Yanor received.  She felt he should have been punished more severely.  Feleccia "felt insignificant and not important" because nothing more was done.  She and Hinsey went to talk to Sacco to see if anything else could be done, but Sacco said they could not discipline Yanor twice.

Feleccia stated Deputy Newsome had called her and told her that he heard her affair with Yanor went wrong.  She said he was wrong but she could not discuss this.  This supposedly

occurred within 24 hours of receiving the purported Department of Public Health letter that was actually from Yanor. Feleccia stated that on that same day, her coworker Janet Edwards heard Deputy McNamara say he heard Feleccia got a disease and he wanted to know what it was.

Feleccia remarried and her new husband's ex-wife worked for the city. The ex-wife went to Feleccia's husband's home one day and told him and his daughter that Feleccia had acquired AIDS from a deputy at her job. Feleccia went to the Sheriff and he said there was nothing he could do about the rumors. This occurred in the summer of 2000.

According to a June 15, 1999, memo from Mike Walton, the director of support services at the Sheriff's Department, Chief Sacco met with Feleccia and Walton on June 10, 1999. At that meeting, Feleccia advised them she was not happy with the discipline imposed on Yanor and that she believed more should have been done to punish Yanor as the incident was being talked about by people throughout the Sheriff's Department. Sacco advised Feleccia that nothing more could be done as far as the Sheriff's Department punishing Yanor went, and the incident had been reported to the Sangamon County State's Attorney by the Illinois Department of Public Health. Feleccia informed Sacco that this had been going on with Yanor since 1998 and there have been several incidents. Sacco stated she should have come

forward at the time of the incidents and made the Sheriff's Department aware of them so actions could have been taken to stop the behavior. Sacco asked Feleccia to document all the previous incidents in writing and send them to him. According to Sacco's testimony before the ALJ, Feleccia never documented these incidents in writing to him.

The evidence showed that in 1998 and 1999, Yanor was one of two sergeants on the second shift. His duties were to assist the lieutenant when he was there in the overall operation of the second shift in relation to making service calls and things of that nature. Yanor or the other sergeant was in charge of the shift when the lieutenant was not on duty, at which times they were in charge of 10 deputies. Only Lieutenant Hinsey made decisions regarding Feleccia's duties or had control over her working conditions. Yanor did not have any supervisory responsibilities over Feleccia, nor did he have the ability to impact her working conditions. Moreover, Yanor did not have any role in Lieutenant Hinsey's appraisal reports on Feleccia's job performance.

Feleccia continued to work in her job throughout all of the alleged incidents. Her working conditions did not change. Lieutenant Hinsey did not notice any changes in Feleccia's work habits or performance, nor did she receive any complaints from Feleccia about having difficulty with her work.

- 10 -

According to Feleccia, she had been seeing a psychiatrist since 1996. She took Paxil "for anxiety, for work stress." After receiving Yanor's letter, Feleccia increased the frequency of her visits to the psychiatrist and the dosage of her medication was doubled. Her psychiatrist instructed her to begin seeing another psychiatrist because he worked for the county. The new psychiatrist changed her medication because she "couldn't control the anxiety and paranoia at work" and also put her on sleeping medication. Feleccia was relieved when she found out the letter was not true but stated "it was horrible." She lost sleep and missed days of work because of the incident. Feleccia admitted she had a panic attack at work prior to receiving the letter from Yanor and that was when she first sought treatment by a psychiatrist.

Following a hearing, the ALJ issued a decision recommending that both the sexual harassment and retaliation claims be dismissed with prejudice. The ALJ concluded Feleccia "failed to establish a prima facie case of sexual harassment in that [she] failed to show the conduct at issue had the purpose or effect of substantially interfering with [her] work performance or created an intimidating, hostile[,] or offensive working environment." The ALJ also concluded Feleccia "failed to establish a prima facie case of retaliation in that the record did not establish either an actual 'protest' of sexual harassment

or a causal link between any alleged complaint of harassment and any adverse act."  As part of his decision, the ALJ found Yanor never held supervisory duties over Feleccia.  He "had no role in giving [Feleccia] orders as to how she should perform her work in hiring, firing, demoting[,] or disciplining any of the civilian employees in the records department."  The ALJ also found the November and December 1998 incidents were outside the 180-day period for reporting incidents of sexual harassment.

On November 3, 2003, Feleccia filed exceptions to the ALJ's recommended order and decision.  The Commission filed its initial decision on August 31, 2004, and a modified order and decision on November 22, 2004.  The Commission disagreed with the ALJ's finding that the November and December 1998 incidents were barred and thus not able to be viewed as part of Feleccia's proof and reversed the ALJ's recommendation to dismiss the sexual-harassment charge.  As to the specific incidents, the Commission concluded the following.  The November 1998 incident where Yanor grabbed Feleccia's arm and did not let her exit the vehicle was "a sexual request by a supervisor tied with a physical threat of force; an action clearly sufficient to establish sexual harassment."  Moreover, "Yanor's December 1998 request to spend the night in a motel with [Feleccia] clearly implies a request to have sexual intercourse.  These acts, namely, the forcible request for a sexual favor and the motel request, constitute

sexual harassment." The Commission further stated "[w]e find that Yanor's conduct, specifically his unwelcome sexual advances and forged Department of Public Health letter, had the effect of substantially interfering with [Feleccia's] work performance and created an intimidating, hostile[,] and offensive working environment." The Commission sustained the recommendation that the retaliation charge be dismissed, finding that Feleccia did not present "evidence of adverse employment actions in retaliation for opposing sexual harassment." The Commission noted Sheriff Williamson told Feleccia not to go to the media and not to press sexual-harassment charges or go near Yanor. The Commission also noted Chief Sacco told Feleccia the punishment was complete and Yanor could not be punished twice after Feleccia replied she thought the punishment was too light. The Commission found the Sheriff's Department's "conduct reprehensible, where they not only failed to take reasonable corrective action, but also where [it] told [Feleccia] not to press charges or go near Yanor." Finally, the Commission also remanded the matter for a determination of damages, attorney fees, and costs.

Upon remand, the ALJ recommended an award of $10,000 damages from which $3,500 would be deducted because of Feleccia's settlement with Yanor and $11,137.50 in attorney fees, $1,593.75 in paralegal fees, and costs of $685.03. On January 3, 2006, the Commission adopted this recommendation and entered a final order

- 13 -

in which it concluded Feleccia timely filed her charge, she established "that Yanor committed a variety of sexually harassing acts that cumulatively constitute[d] a hostile work environment," and the Sheriff's Department was strictly liable for Yanor's conduct because he was a supervisor even though he was not Feleccia's supervisor and he did not have the authority to affect the terms or conditions of Feleccia's work. The order listed the Department of Human Rights as an additional party of record and a copy of the order was delivered to the Department of Human Right's chief legal counsel.

The Sheriff's Department filed an application for rehearing. The Commission denied the application, again listing the Department of Human Rights as an additional party of record. Thereafter, the Sheriff's Department timely filed its petition for review with this court. The petition named the Commission, Feleccia, and Yanor as respondents to the action but did not name the Department of Human Rights.

## II. ANALYSIS

The Sheriff's Department argues that the Commission erred by (1) imposing strict liability on the Sheriff's Department for Yanor's conduct, (2) considering unreported acts by Yanor that occurred outside the 180-day jurisdictional period, and (3) finding Feleccia established actionable sexual harassment. The Commission responds that (1) this action should

- 14 -

be dismissed because the Sheriff's Department failed to name the Department of Human Rights as a respondent in its petition for review; (2) the Commission correctly concluded that Feleccia established sexual harassment in violation of the Act; and (3) the Sheriff's Department is strictly liable for Yanor's sexual harassment of Feleccia.

### A. Should This Action Be Dismissed for Failure To Name the Commission on the Petition for Review?

The Commission correctly notes that petitioners must strictly comply with statutory requirements for seeking review of administrative decisions or their appeals may be dismissed. Our supreme court has held that administrative-review actions involve the exercise of "special statutory jurisdiction." ESG Watts, Inc. v. Pollution Control Board, 191 Ill. 2d 26, 30, 727 N.E.2d 1022, 1025 (2000). "When a court is exercising special statutory jurisdiction the language of the act conferring jurisdiction delimits the court's power to hear the case. A party seeking to invoke special statutory jurisdiction thus 'must strictly adhere to the prescribed procedures' in the statute." ESG Watts, Inc., 191 Ill. 2d at 30, 727 N.E.2d at 1025, quoting McGaughy v Illinois Human Rights Comm'n, 165 Ill.2d 1, 12, 649 N.E.2d 404, 410 (1995).

Supreme Court Rule 335 sets forth the procedures for a statutory direct review of an order by an administrative agency. 155 Ill. 2d R. 335. Rule 335(a) states "[t]he petition for

review shall be filed in the Appellate Court and shall specify the parties seeking review and shall designate the respondent and the order or part thereof to be reviewed.  The agency and all other parties of record shall be named respondents."  155 Ill. 2d R. 335(a).  The Commission argues the Sheriff's Department did not comply with Rule 335 because it did not designate the Department of Human Rights as a respondent in the petition for review.  The Sheriff's Department responds that the Department of Human Rights is not a party of record in this case.  We agree with the Sheriff's Department.

The Commission relies on a number of statutes and administrative rules, along with our supreme court's decision in McGaughy, 165 Ill. 2d 1, 649 N.E.2d 404, as support that this appeal must be dismissed for the Sheriff Department's failure to name the Department of Human Rights on the petition for review. See 775 ILCS 5/8-105(A)(3) (West 2004) (approval of a settlement shall be accomplished by an order, served on the parties and the Department); 56 Ill. Adm. Code §§5300.640(b), 5300.730(a)(3)(A) (Conway Greene CD-ROM June 2003) (an answer, supplemental answer, or motion to dismiss or response thereto shall be served on the Department); 56 Ill. Adm. Code §5300.730(a)(3)(B) (Conway Greene CD-ROM June 2003) (a motion to amend the pleadings must be served on Department).  The Commission also notes that in situations where the Department of Human Rights filed the complaint, it may

file a motion with the Commission seeking leave to amend the complaint (56 Ill. Adm. Code §5300.650(a) (Conway Greene CD-ROM June 2003)) and may move for entry of an order permitting it to file a response to a motion to dismiss (56 Ill. Adm. Code §§5300.640(b), 5300.730(b) (Conway Greene CD-ROM June 2003)).

The Commission further points out that its final order and the order denying rehearing both named the Department of Human Rights as a party of record. However, the Department of Human Rights does not become a party of record solely because the Commission's final order states the Department of Human Rights was an additional party of record. See Burgess v. Board of Fire & Police Commissioners of the City of Quincy, 209 Ill. App. 3d 821, 829, 568 N.E.2d 430, 435 (1991). "An administrative agency, such as the Commission, obtains its power to act from the legislation creating it and its power is strictly confined to that granted in its enabling statute." Gilchrist v. Human Rights Comm'n, 312 Ill. App. 3d 597, 601, 728 N.E.2d 566, 570 (2000). Neither the Commission or Feleccia, nor our independent research, has led us to a statute that gives the Commission the power to make the Department of Human Rights a party of record. In fact, the cases and administrative rules cited by the Commission and Feleccia lead us to conclude the Department of Human Rights is not a party of record.

In McGaughy, our supreme court consolidated two cases

involving appeals from the Commission's review of decisions by the Department of Human Rights to dismiss charges. McGaughy, 165 Ill. 2d at 4-6, 649 N.E.2d at 406-07. In each of the cases before the court, the petitions for review failed to name the Department of Human Rights as a respondent. The supreme court concluded that "neither petitioner fully complied with the requirement of Rule 335(a)." McGaughy, 165 Ill. 2d at 8, 649 N.E.2d at 408. In coming to its conclusion to dismiss both appeals, the court noted that Rule 335(a) was made applicable to the cases before it by section 8-103 (775 ILCS 5/8-103 (West 2004)) of the Human Rights Act, which requires the Department of Human Rights to be named as a respondent when the Commission reviews the Department of Human Rights' decision to dismiss a charge. McGaughy, 165 Ill. 2d at 7, 649 N.E.2d at 408. The case before us does not involve the review of the Department of Human Rights' decision to dismiss a case. Thus, McGaughy and the statute that made Rule 335 applicable to it are not instructive in this case.

The Sheriff's Department contends the case of In re Toledo, 312 Ill. App. 3d 131, 726 N.E.2d 43 (2000), supports its position. In Toledo, the Attorney General contended the Department of Human Rights should be dismissed from that appeal because it was neither the agency whose order was the subject of the appeal nor a party of record to the proceedings before the

Commission.  Toledo, 312 Ill. App. 3d at 136, 726 N.E.2d at 47.
The court dismissed the Commission from the appeal because "the
Commission was the final decision maker who acted as the
'administrative agency' whose order both affected 'the legal
rights, duties[,] or privileges of parties' and terminated the
proceedings before it (735 ILCS 5/3-101 (West 1998)), and *** the
Department [of Human Rights] was not a party of record to the
proceedings before the Commission." (Emphasis in original.)
Toledo, 312 Ill. App. 3d at 136, 726 N.E.2d at 47-48.  The
Commission distinguishes Toledo from the case before us on the
ground that in Toledo the Commission did not name the Department
of Human Rights as a party of record as it did here.  However, we
have already stated that the Commission does not have the
authority to do that.  Moreover, we note the Commission's form
entitled "Information for litigants before the Human Rights
Commission" states the following:

> "Any answer, supplemental answer, motion to
> dismiss or response thereto, motion to amend
> the complaint and motion to allow a
> Department employee to testify at hearing
> must be served on the Department of Human
> Rights (which is a separate state agency from
> the Commission) as well as upon the parties.
> Copies of other motions and all discovery

- 19 -

requests and responses need not and <u>should</u> <u>not</u> be sent to the Department, unless the Department is a named party on the complaint."  (Emphasis in original.)

Here, the Department of Human Rights filed the complaint but is not a named party on the complaint.  Further, a review of the record shows the Department of Human Rights did not have anything to do with the case after filing the complaint, and previous Commission orders reflect that by not listing the Department of Human Rights as a party of record or serving copies of its orders upon it (see November 30, 2000, February 28, 2001, May 23, 2001, August 15, 2001, September 4, 2002, October 10, 2002, April 30, 2003, and December 1, 2004, orders).  We do acknowledge that several orders were served on the Department of Human Rights, including at least two that named it and its chief counsel as additional parties of record (January 3, 2006, order and decision and April 26, 2006, denial of petition for rehearing).  We also note the Commission's order and decision of August 31, 2004, and modified order and decision from November 22, 2004, do not name the Department of Human Rights as a party of record but copies of the orders were delivered to its chief legal counsel.  The caption on all of these orders does not list the Department of Human Rights as a party.

We find further support for rejecting the Commission's

reliance on the numerous above-cited statutes and regulations for support of its argument that the Department of Human Rights is a party of record in the administrative rules and statutes themselves. For example, the administrative rules provide for the Department of Human Rights to submit a brief "in a matter where it is not a party." 56 Ill. Adm. Code §5300.980 (Conway Greene CD-ROM June 2003). Thus, the rules recognize the Department of Human Rights is not always a party. Moreover, as the Sheriff's Department notes, many of the rules cited by the Commission as support for finding the Department of Human Rights was a party of record distinguish between parties and the Department of Human Rights by requiring certain pleadings to be served on both the parties and the Department of Human Rights. If the Department of Human Rights is already considered a party, the remaining language is meaningless. See Mora v. Industrial Comm'n, 312 Ill. App. 3d 266, 272, 726 N.E.2d 650, 654-55 (2000) (When construing an administrative rule, the court stated "[i]t is a basic tenet of statutory construction that a statute should be construed so that no word or phrase is rendered superfluous or meaningless").

### B. Is the Sheriff's Department Strictly Liable for Yanor's Sexual Harassment of Feleccia?

"Section 2-102(D) of the Act provides that an employer is liable for (1) a supervisor's sexual harassment of an employee and (2) a nonsupervisory employee's sexual harassment of an

- 21 -

employee 'if the employer becomes aware of the conduct and fails to take reasonable corrective measures.'" Pinnacle Limited Partnership v. Human Rights Comm'n, 354 Ill. App. 3d 819, 829, 820 N.E.2d 1206 (2004), quoting 775 ILCS 5/2-102(D) (West 2002). The Sheriff's Department contends it cannot be held strictly liable because Yanor was not Feleccia's supervisor and he did not have the authority to affect the terms or conditions of Feleccia's employment. Feleccia and the Commission respond that because Yanor was a supervisor with the Sheriff's Department, it is immaterial that he was not Feleccia's supervisor. We agree with the Sheriff's Department.

The specific statute at issue is section 2-102(D) of the Act (775 ILCS 5/2-102(D) (West 2004)). That section makes it a civil rights violation for:

> "any employer, employee, agent of any
> employer, employment agency or labor
> organization to engage in sexual harassment;
> provided, that an employer shall be
> responsible for sexual harassment of the
> employer's employees by nonemployees or
> nonmanagerial and nonsupervisory employees
> only if the employer becomes aware of the
> conduct and fails to take reasonable
> corrective measures." 775 ILCS 5/2-102(D)

- 22 -

(West 2004).

The parties do not cite, nor has our research led us to, a provision in the Act defining who is a managerial or supervisory employee.

The Commission and Feleccia cite Board of Directors, Green Hills Country Club v. Human Rights Comm'n, 162 Ill. App. 3d 216, 221, 514 N.E.2d 1227, 1230-31 (1987), and Geise v. Phoenix Co. of Chicago, Inc., 159 Ill. 2d 507, 518, 639 N.E.2d 1273, 1277 (1994), for the proposition that section 2-102(D) of the Act imposes strict liability on employers when an employee has been sexually harassed by a supervisor regardless of whether the employer knew of the offending conduct. This proposition is correct. However, in both those cases, the supervisor who harassed the employee was the employee's supervisor who had control over the employee. In Green Hills Country Club, the harasser was the club manager who had the power to change the complainant from a salaried employee to an hourly employee, relieve her of her position, and reduce her hours of employment. Green Hills Country Club, 162 Ill. App. 3d at 218, 514 N.E.2d at 1229. In Geise, the harasser was the employer's national sales manager and Geise alleged she was fired "'as a measure by [the national sales manager] to retaliate against [Geise] for her failure to submit to his sexual advances and her attempts to inform [the employer] of his actions.'" Geise, 159 Ill. 2d at

511, 639 N.E.2d at 1274. That is not the case here. Here, the evidence shows Yanor did not have any authority over Feleccia or the conditions of her employment. In their appellate briefs submitted prior to oral argument, neither the Commission nor Feleccia cited a case or statute that dictates an employer is strictly liable when an employee is sexually harassed by a person who holds a supervisory position, albeit a position in a different department where that person does not have any supervisory control or authority over the employee alleging harassment. Our research has not led us to such a case.

As stated, the Act does not provide guidance as to who is a manager or supervisor for purposes of imposing strict liability on an employer for the actions of a managerial or supervisory employee. Thus, "it is assumed that words used in the statute were intended to have their ordinary and popularly understood meaning." Winks v. Board of Education of Normal Community Unit School District No. 5 of McLean County, 78 Ill. 2d 128, 137, 398 N.E.2d 823, 827 (1979). When seeking to ascertain the ordinary and popularly understood meaning of words used in a statute it is helpful to refer to dictionary definitions. Winks, 78 Ill.2d at 137, 398 N.E.2d at 827. Black's Law Dictionary defines "supervisor" as "any individual having authority to hire, transfer, suspend, lay off, recall, promote, discharge, discipline, and handle grievances of other employees, by

- 24 -

exercising independent judgment." Blacks Law Dictionary 1452 (7th ed. 1999). A "manager" is "[a] person who administers or supervises the affairs of a business, office, or other organization." Black's Law Dictionary 972 (7th ed. 1999). Yanor did not possess any of these powers as they relate to Feleccia and thus the Sheriff's Department is not strictly liable for his actions. Instead, Yanor was a coemployee of Feleccia's. As such, the Sheriff's Department is only liable for his harassment of Feleccia if the Sheriff's Department knew or should have known about the harassment and failed to take reasonable corrective measures. See 775 ILCS 5/2-102(D) (West 2004). Here, the evidence shows the Sheriff's Department took corrective measures upon learning of Yanor's harassment of Feleccia. It launched an investigation into who wrote the ficticious Department of Public Health letter. Upon learning Yanor was the author of the letter, the Sheriff's Department suspended Yanor for four days without pay and issued Yanor a letter of reprimand.

The parties do not dispute that there would be no strict liability had this been a federal lawsuit. Moreover, at oral argument, we asked the parties whether they were aware of any other court in any jurisdiction that has held an employer strictly liable under facts similar to this case, i.e., where the harasser had managerial or supervisory control over some employees but had no control over the person allegedly harassed.

Neither party was aware of such a case. We gave the parties additional time to research the issue and submit supplemental briefs to this court. The parties have done so. Our review of the supplemental briefs and the cases cited therein, in addition to our own research, reveals no cases where strict liability was imposed when (1) the statute at issue had similar language to section 2-102(D) of the Act and (2) the facts were similar to those present in this case. We are unwilling to stretch the language of section 2-102(D) to impose strict liability on the Sheriff's Department for Yanor's conduct.

Because we have concluded the Sheriff's Department is not strictly liable for Yanor's conduct and the Sheriff's Department took corrective measures upon learning of that conduct, we need not address the other issues involved in this case.

### III. CONCLUSION

For the reasons stated, we reverse the Commission's order.

Reversed.

STEIGMANN, P.J., and COOK, J., concur.