2022 IL App (4th) 200357

NOS. 4-20-0357, 4-20-0358 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE CHAMPAIGN-URBANA PUBLIC HEALTH DISTRICT,<br><br>    Petitioner,<br>    v.<br>THE ILLINOIS HUMAN RIGHTS COMMISSION,<br>THE DEPARTMENT OF HUMAN RIGHTS, and<br>PATRICIA HUNT,<br>    Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Petition for review of orders<br>of Illinois Human Rights<br>Commission<br>Nos. 05SF2282<br>  07SF1305 |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1    This case stems from a series of employment decisions between the parties and raises the question of whether they were racially motivated. The first decision, in 2004, involved a demotion and decrease in salary. The second decision, in 2006, involved a series of failures to promote an ostensibly qualified applicant.

¶ 2            I. INTRODUCTION

¶ 3           A. The Demotion Case

¶ 4    Patricia Hunt, an African American, was a long-time public health nurse at the Champaign-Urbana Public Health District (District). In November 2004, Hunt's job title was program coordinator of community health nurses. As part of a restructuring that same month, the District eliminated Hunt's program coordinator position and demoted her back to her prior

position, which was public health nurse I.

¶ 5 In January 2005, Hunt filed a charge of racial discrimination against the District in the Department of Human Rights (Department) based on the demotion, alleging (1) that she continued to perform the duties of a program coordinator but at a decreased salary and (2) a similarly situated white employee, when her coordinator position was eliminated in 2003, (a) also continued to perform the same (program coordinator) duties but (b) was demoted to a public health nurse II (a higher paying job title) without a decrease in salary.

¶ 6 B. The Failure To Promote Case

¶ 7 In 2005 and 2006, Hunt twice applied for a nursing services manager position and twice applied for a public health nurse II position. In January 2006, the District hired a white applicant, Sylvia Link, for the nursing services manager position. In June 2006, the District again hired a white applicant, Jamie Perry, for the nursing service manager position (which was unexpectedly vacated by Link).

¶ 8 Later in June 2006, the District hired a white applicant, Ellen Weise, for a public health nurse II position. When Weise also unexpectedly left, the District hired Andrea Taylor, another white applicant, to fill the public health nurse II position.

¶ 9 In December 2006, Hunt filed additional charges of racial discrimination with the Department against the District based on these four hiring decisions, in which she alleged she was more qualified than the white applicants. Hunt retired from the District in 2007.

¶ 10 C. Common Procedural History

¶ 11 Both the demotion case and the failure to promote case proceeded to separate evidentiary hearings in front of the same administrative law judge (ALJ). In January 2014, in the demotion case, the ALJ entered a recommended order and decision (ROD) concluding Hunt failed

to demonstrate a *prima facie* case of race discrimination and recommended dismissal. In February 2015, the ALJ entered a similar ROD with similar findings in the failure to promote case.

¶ 12    In both cases, Hunt filed exceptions to the RODs with the Illinois Human Rights Commission (Commission) challenging the ALJ's findings. The District filed responses to Hunt's exceptions.

¶ 13    In 2017, the Commission reviewed the ROD in each case and voted not to adopt the recommendations, concluding instead that Hunt had proved her charges of race discrimination. In May 2019, the Commission entered two separate remand orders, explaining its findings and remanding to the ALJ for determinations as to damages.

¶ 14    In 2019, the ALJ entered supplemental RODs in which the ALJ challenged the Commission's authority to enter the remand orders because the terms of office of some of the commissioners who entered the remand orders had expired before those orders were entered. In 2020, the Commission *sua sponte* struck the supplemental RODs, reaffirmed its prior remand orders, and remanded again for damages determinations.

¶ 15    Later in 2020, the ALJ entered second supplemental RODs awarding damages. In the demotion case, the ALJ awarded Hunt $7629 in back wages, plus attorney fees and costs. In the failure to promote case, the ALJ awarded $40,987 in back wages, plus attorney fees and costs. Neither party filed any exceptions to the second supplemental RODs, which, by law, became the final orders of the Commission.

¶ 16    In this court, the District sought direct administrative review of the final orders in each case, and this court consolidated the cases on appeal.

¶ 17                D. The Parties' Arguments and Our Holdings

¶ 18    The State respondents—namely, the Commission and the Department (hereinafter

collectively the State)—argue this court lacks jurisdiction to review the Commission's decisions because the District did not exhaust its administrative remedies. Alternatively, the State argues that the Commission's findings were not against the manifest weight of the evidence.

¶ 19       The District, meanwhile, argues that the Commission's remand orders are void because they bear the signatures of commissioners whose terms had expired when the orders were issued. In the alternative, the District contends the Commission's findings were against the manifest weight of the evidence in each case because Hunt failed to (1) establish a *prima facie* case of race discrimination and (2) demonstrate that the District's legitimate, nondiscriminatory reasons for taking actions against Hunt were a pretext for race discrimination.

¶ 20       We address each argument in turn and conclude as follows: (1) the State has not demonstrated that the District failed to exhaust its administrative remedies, (2) the Commission's remand orders were valid, (3) the Commission's finding of race discrimination in the demotion case was not against the manifest weight of the evidence, and (4) the Commission's finding in the failure to promote case was against the manifest weight of the evidence.

¶ 21                                    II. BACKGROUND

¶ 22       As an initial matter, we note that the arguments in this case relate only to the Commission's ultimate findings and their validity. Accordingly, we begin where the parties begin in their briefs, with the evidentiary hearings in each case.

¶ 23                                  A. The Demotion Case

¶ 24       In August 2011, the ALJ conducted an evidentiary hearing on Hunt's charge of race discrimination in her 2004 demotion. Hunt alleged that in November of 2004 she was demoted from program coordinator of community health nurses (a management position) to a public health nurse I, which resulted in a decrease in salary, while a similarly situated white employee, Karen

McKinzie, was demoted in July 2003 from a program coordinator position to a public health nurse II position with no change in salary. The District admitted that Hunt (1) was a member of a protected class, (2) was meeting job performance expectations, and (3) suffered an adverse employment action—namely, a demotion with a decrease in salary. The District denied that McKinzie was a similarly situated employee and maintained that Hunt was demoted because her position was eliminated as part of the District's restructuring effort to increase the efficiency of its services.

¶ 25             1. *The Primary Evidence at the Administrative Hearing*

¶ 26                          a. David King

¶ 27             David King testified that he was the administrator of the District from August 1999 to 2005. In that position, King was essentially the executive director of the agency and reported to the Champaign-Urbana Board of Health (Board), who were elected officials. King explained that the District provided a variety of services to the public such as immunizations, physicals, and diagnosis and testing of sexually transmitted diseases. It also provided educational information geared towards preventative care.

¶ 28             When he began as administrator, the District was separated by profession. In other words, there were divisions of nutritionists, nurses, and social workers, among other divisions. King wanted to reorganize the District by what services were being provided, which he believed would help increase efficiency and cooperation, thereby providing better services. (We note King testified that, over a period of years, several reorganizations took place that created new divisions and moved various personnel. As a result, division names and job titles frequently changed without the job duties or division responsibilities changing. Additionally, the witnesses testified that although their formal job titles changed, as a practical matter, they did not change the terminology

of the various jobs.)

¶ 29        In the fall of 2002, the District hired Sylvia Coronado-Romero as director of human resources. At King's and the Board's request, Coronado-Romero undertook an in-depth review of the job and salary structure at the District. As part of this effort, the division directors and their managerial staff reviewed, updated, and rewrote the job descriptions at the District so they could reorganize employee classifications into a new cohesive scheme. Eventually, the directors and Coronado-Romero put together a recommendation of new job descriptions, titles, and salaries to be applied to all the positions in the District, which the Board approved and implemented in July 2003.

¶ 30        Under the new arrangement, if a reclassified employee moved to a position with a higher salary, that employee would receive that higher salary. Employees reclassified into positions with lower pay would maintain their current salary but would not receive increases until the periodic cost of living adjustments caught up to their current salary. Five employees, including Hunt, were reclassified into positions with lower pay.

¶ 31        King explained that before reorganization, the District had two types of nurses: "public health nurses," which required a bachelor's degree in nursing, and "clinic nurses," which only needed an associate's degree in nursing. (We note that these distinctions were less meaningful than they appear. Public health nurses performed a wide variety of very different functions, including doing some clinical work (*e.g.*, flu shots). Clinic nurses worked primarily in clinical settings, assessing patient health, performing medical testing, and administering immunizations.)

¶ 32        The July 2003 reclassifications eliminated the titles of public health nurse and clinic nurse. Instead, all nurses were reclassified as a public health nurse I or II, which were newly distinguished by job responsibilities rather than education. (Again, we note that the title changes

and job reclassifications were formal matters that did not change how employees described their jobs. For instance, although they were now formally public health nurse I's, the District continued to informally distinguish between community health nurses (like Hunt) and clinic nurses.)

¶ 33        In the fall of 2003, Cindy Noa, the director of community health nursing and clinical services (commonly known as the director of nursing), asked King to create a program coordinator of community health nurses position. The program coordinator position was designed to help Noa focus on her administrative and policy writing duties by having Hunt supervise the community health nurses under Noa, coordinate their schedules, and coordinate with other divisions (who used the same office space, materials, and sometimes shared nurses). King promoted Hunt into that position upon Noa's recommendation.

¶ 34        In December 2003, King learned Noa was leaving the District at the end of January 2004. Noa recommended that Hunt become the interim director of nursing. King asked Hunt if she was willing to do so, and Hunt said she was. King and Hunt agreed to discuss any potential increase in pay at a later date. King stated they discussed salary several times but could not reach an agreement. As a result, King assumed the position of interim director until a new director, Marsha Atkins, was hired in June 2004. King asked Hunt to continue her program coordinator duties while he was interim director and did his best to supervise the community health nurses. He denied, however, telling Hunt that she had to keep performing these duties to protect her job.

¶ 35        King testified that Hunt did not perform any significant additional duties while she served as interim director because he took over those duties within two weeks "to the extent that she started them." King explained that, as program coordinator, Hunt already supervised most of the people in the division. The interim position required her to be the coordinator for the clinical nurses and the vision and hearing technicians. King stated that Hunt "likely" did not attend

directors' meetings or manage the division because he never formally promoted her to interim director before he took over the position.

¶ 36 In November 2004, the District's clinic nurses were split into two groups and reorganized into the division of family health and division of HIV/STD in an attempt to improve the clinical services in both divisions. That way, each division's directors would have direct supervision of the nurses. King stated that the reorganization significantly reduced the size of the division of community health nursing because five or six clinic nurses were moved into other divisions.

¶ 37 At that time, King eliminated the program coordinator positions for community health nursing, held by Hunt, and clinical services, which was vacant. (King never explained what the program coordinator of clinical services position entailed or who, if anyone, ever held the position.) Because of the decrease in employees, Marsha Atkins, the director of nursing, said she could now supervise the community health nurses and would take over Hunt's program coordinator responsibilities. Hunt returned to her prior position of community health nurse (formally designated as public health nurse I) and her prior salary.

¶ 38 King denied ever discussing race as part of the decision to demote Hunt.

¶ 39 b. Karen McKinzie

¶ 40 McKinzie testified that she worked for the District as the HealthWorks program manager. HealthWorks was a medical case management program for children in foster care. HealthWorks employed case managers who monitored the health of children in foster care to ensure they received regular and adequate medical care, such as physicals, immunizations, hearing and vision screenings, and dental exams.

¶ 41 McKinzie testified she started at the District in 1995 as a case manager before

becoming the program manager. McKinzie explained that the program manager position was essentially the same as a program coordinator position at the District and she performed the same or similar functions as other program coordinators in the District.

¶ 42        McKinzie testified that she was the program manager in July 2003 when she was reclassified as a public health nurse II. McKinzie testified that she did not consider the reclassification as a demotion, her job responsibilities and salary did not change, and in practice, her title did not change; she was still called a program manager. McKinzie stated that before the reorganization, there were two case managers in HealthWorks who handled (1) Department of Child and Family Services (DCFS) wards, (2) Adverse Pregnancy Outcome Reporting System (APORS) infants, and (3) pregnant DCFS wards and their children. After the reorganization, McKinzie got all the pregnant DCFS wards and their children and all wards that were APORS. McKinzie considered it to be an increase in workload.

¶ 43        McKinzie explained APORS as follows: "basically it's the high-risk babies, some have been in neonatal [intensive care], some have not been in neonatal but have been drug exposed." Completion of a pediatric assessment course (learning how to do physical exams on babies) was necessary to manage those cases. She would have to conduct home visits periodically depending on the child's age. For example, visits occurred at age 2 weeks, between 2 and 4 months, 6 months, 1 year, 18 months, and 2 years. Home visits also occurred with pregnant wards with children. McKinzie explained the work she performed was more administrative than patient focused.

¶ 44        McKinzie stated that Les Hitchens was the director of the family health division. HealthWorks was in that division, and Hitchens was McKinzie's director. Prior to her reclassification, McKinzie supervised two other workers in HealthWorks by keeping track of

vacation time and sick days and conducting evaluations. She was also involved in hiring and firing decisions. McKinzie no longer performed those duties after July 2003. McKinzie testified that, in 2003, King was her direct supervisor and signed her time and activity logs. At some point in time, Hitchens became her supervisor and signed the logs.

¶ 45                                    c. Patricia Hunt

¶ 46          Hunt testified that she began working for the District as a clerk typist in 1977. She became a registered nurse (RN) after graduating in 1991with an associate degree in nursing. She then became a clinic nurse working in the communicable diseases division. She performed testing and lab work designed to discover if individuals in the community had HIV/AIDS, hepatitis, tuberculosis, and other sexually transmitted diseases (STDs). In 1995, Hunt worked in the HealthWorks department as a case manager dealing with DCFS wards and APORS infants. She obtained the necessary certifications to evaluate and perform developmental assessments of infants, which she would perform periodically during home visits. She also educated foster parents and conducted workshops.

¶ 47          In 1998, Hunt received a bachelor's degree in nursing and was reassigned to the community health nursing division as a public health nurse. In 2002, she received a master's degree in public administration.

¶ 48          Between 1998 and 2003, Hunt performed various nursing-related activities, including making home visits to elderly residents to assist them with medication, health assessments, and remaining in their homes. Hunt also worked as the Heart Smart for Women Facilitator, running the program by complying with grant requirements, organizing speakers and educational sessions, and recruiting participants. Hunt helped with the Illinois Breast and Cervical Cancer Program, performing case management, assisting with grant provisions, collaborating with

participating physicians, and scheduling appointments for participants. Hunt also worked as a Teen Parent Services case manager, which required that she case-manage pregnant teens and teen parents, as well as conduct workshops and home visits. Hunt served as the coordinator for the lead program and ran the entire program. She was trained to do home visits to test children's blood for lead. She would then coordinate with another division at the District, the division of environmental health, to go to the home and test paint and materials to determine where the lead was.

¶ 49    In November 2003, Hunt was promoted to program coordinator for community health nursing. Hunt described her job as essentially being an assistant director to Noa. Hunt supervised around 10 people: 8 nurses and 2 staff. Hunt explained, "I did the benefit packages for the people I was over. I did chart reviews. I even did some evaluations. I sat in on interviews. I submitted reports." Hunt also had her normal patient caseload and was responsible for setting up various off-site health clinics and flu-shot clinics. Hunt supervised two people in the vision and hearing division. Hunt testified that she continued in that role until November 2004.

¶ 50    In February 2004, Noa left the District, and Hunt became the interim director of nursing. Hunt continued to perform her program coordinator duties and then was also in charge of a range of new responsibilities—namely, overseeing additional employees and coordinating with other divisions.

¶ 51    Hunt testified that she had four to five conversations with King about a pay increase but King kept saying they would talk about it later. After three weeks, King eventually made an offer that was "not very much more than what [Hunt] was already making." King said he would look into it, but sometime later informed Hunt that "he didn't have to pay [her] any additional monies, that he could get [her] to do the work anyway because one of his co-workers told him that he had the authority to do that."

¶ 52    Hunt maintained that King took over the title of interim director of nursing in June 2004 but Hunt continued to perform all of those duties. Hunt testified that in July 2004, when the District hired Atkins as director of nursing, Hunt's responsibilities and duties did not change. Hunt was required to orient Atkins and help her learn the job. Hunt also said that she trained Atkins on various duties which took Atkins longer than normal to learn. At some point, Atkins's focus shifted to clinical nursing services, and Hunt continued to provide Atkins significant help to complete her director responsibilities. Hunt acknowledged that Atkins did take over some of the director duties. In particular, Hunt stopped supervising the community health nurses in November 2004.

¶ 53    Hunt maintained she continued to perform these duties until Atkins left in April or May 2005. At that time, King told Hunt that "in order to not jeopardize [her] job [Hunt] had to do it," meaning "[a]ll the tasks and responsibilities" of the director.

¶ 54    Hunt acknowledged at one point that she was reclassified as a public health nurse I in July 2003. Hunt explained that in November 2004, the District moved clinical nurses to a different division. However, that reorganization had an impact on what she was doing "only ***￼ in words. It didn't impact anything that I was doing. I continued to do what I was doing for a big portion of the time."

¶ 55    Hunt described her learning of the demotion as follows. On November 8, 2004, she was called into a conference room with King and Atkins. King handed Hunt a letter with a smile on his face and told her to read it. The letter indicated Hunt's program coordinator position was being eliminated because the clinic nurses were no longer in the community health nursing division and Hunt was being returned to the public health nurse I position at a decreased salary. King told her to "note" the last sentence, which asked her to continue "providing important community health nursing services in [her] new role," and said, "I'm sure you will continue your duties and

do the best of your abilities for us. Right?" Hunt said she should be a public health nurse II, and King said he would have to talk to the human resources director. King later told Hunt that, according to Coronado-Romero, Hunt's duties were not sufficiently high risk to be considered a public health nurse II. Every time Hunt complained, King said she would have to keep doing what she was doing if she did not want to jeopardize her job.

¶ 56                                    d. Staci Rossman

¶ 57            Staci Rossman testified that she started working for the District as an administrative assistant in 2004. For a time, she "functioned as an executive assistant for the administrator." She held that position in late 2005. The administrator at that time was Vito Palazzolo. She attended all Board meetings, was responsible for the minutes, and helped with the scheduling of interviews and posting of jobs.

¶ 58            Rossman recalled that someone from management staff ("It could've been Dave King. It could've been Vito Palazzolo, or it could've been Sylvia Coronado-Romero.") said Hunt would never get promoted no matter what job she applied for. Rossman also recalled someone saying, "[Hunt] was the typical black woman that felt she deserved something because she was black." Rossman believed Palazzolo made that comment but could not be sure. She also believed the comments were made at the end of 2005 or during 2006, but she could not recall. She believed the comment was made after Hunt had applied for a position and before a decision had been made.

¶ 59                                    e. Julie Pryde

¶ 60            Julie Pryde was part of the committee for job reclassification and explained that the distinction between public health nurse I and II was based on what the nurses actually did in their jobs. Her understanding was that public health nurse IIs were running programs in addition to their nursing duties. Because every nurse performed public health nurse I duties, something more was

required for a public health nurse II position, such as running a program or taking care of high-risk clients or some other additional duties and work. Pryde testified that job reclassification decisions were all made by consensus of the directors. She never heard any racial comments or discussions during meetings, let alone about Hunt.

¶ 61        Pryde recalled that McKinzie was a program manager or coordinator and became a public health nurse II because she was running the HealthWorks program. "[N]othing was different. We just changed her title."

¶ 62                                    f. Damages

¶ 63        The parties presented testimony and documentary evidence relating to Hunt's alleged lost wages as a result of her demotion. However, the amount of damages is not an issue on review.

¶ 64                              2. *The ALJ's ROD*

¶ 65        In January 2014, the ALJ issued a recommended order and decision (ROD). The ALJ concluded that Hunt failed to establish a *prima facie* case of race discrimination because she had not established a proper "comparator." Specifically, Hunt had argued that McKinzie was a similarly situated employee who was not a member of a protected class and was treated more favorably than Hunt. The ALJ concluded that McKinzie's job duties—providing more administrative services and monitoring high-risk infants and youths—were too different from Hunt's, which were primarily conducting in-home visits with the elderly and, on occasion, homes of children where the presence of lead paint was suspected. Similarly, when McKinzie was named a public health nurse II in July 2003, she maintained her existing duties but took over the entire caseload of another case manager.

¶ 66        Alternatively, the ALJ concluded that Hunt failed to demonstrate that the District's

explanation for adverse treatment was a pretext for race discrimination. The ALJ described the District's legitimate, nondiscriminatory reasons for eliminating Hunt's program coordinator position as (1) the need to reorganize the nurses within the agency to provide more specialized training and (2) a need to economize after the assumption of Hunt's duties by the director of nursing.

¶ 67 The ALJ noted that Hunt was classified as a public health nurse I in July 2003 and she did not contest that reclassification at the time. Instead, she was promoted to a program coordinator position in November 2003. Although she continued to do those duties, and some of the interim director of nursing duties, the District hired a new director of nursing, Atkins, in July 2004. The testimony showed that Atkins took over Hunt's program coordinator duties in November 2004 when the position was eliminated and Hunt was returned to her prior position as a public health nurse I. The ALJ found that (1) Hunt presented no evidence that the reorganization and elimination of her position was a pretext and (2) Hunt's demotion was not comparable to McKinzie's reclassification in 2003 because Hunt lost substantial responsibilities while McKinzie took on more.

¶ 68                                              3. *The Remand Order*

¶ 69 Subsequently, Hunt filed exceptions to the ALJ's ROD, and the District filed a response. The Commission agreed to review the case and conducted oral arguments in June 2017. The case was heard by a three-commissioner panel consisting of Nabi Fakroddin, Hermene Hartman, and Eleni Bousis. After oral arguments, the panel discussed the case in a closed session. Immediately thereafter, the panel voted on the record to (1) reject the ALJ's ROD as against the manifest weight of the evidence, (2) enter an order finding in favor of Hunt, and (3) remand the case for a determination on damages.

¶ 70    In May 2019, the Commission entered a written remand order signed by Hartman, Fakroddin, and Beth Gash. Footnotes on the first page of the order indicate that the order "is entered in conformity with a vote cast by [each commissioner] during her term." In its order, the Commission wrote the following:

"ALJ Robinson asserted that Ms. Karen McKinzie was not a satisfactory 'comparative' because she was a nurse in a different division, when demoted, they returned to the original positions: McKenzie [*sic*] back to a Public Health Nurse II; and the Complainant [(Hunt)] back to a Public Health Nurse I. And the severity and complexity of the work involved in the duties associated with each role varied.

However, the Commission does not agree with ALJ Robinson's assessment. Here, the Commission finds that the Complainant did, in fact, establish a *prima facie* case of race discrimination and that McKinzie was a proper 'comparative'. In accessing the Complainant's long tenure with the Respondent [District], the Commission found that the Complainant performed many of the same duties and successfully managed the same responsibilities than McKinzie. For example, the Commission examined the Complainant's history with the Respondent and learned that during her tenure with the Respondent, the Complainant achieved great academic success by earning her RN license in May 1991, her Bachelor's degree in Nursing in 1998, and a Master's Degree in Public Administration in 2002.

During these years, the Complainant handled various nursing-related activities, including, but not limited to, service as a case manager with the children in the Adverse Pregnancy Outcome Reporting System ('APORS') where she made

- 16 -

periodic visits to the homes of high-risk infants; service as a Public Health Nurse in the Community Health Nursing Department where she made home visits to elderly residents in an effort to assist them in remaining in their homes; handling additional duties in the Heart Smart for Women Program, Illinois Breast and Cervical Cancer Program, and the Lead Program. In addition to obtaining academic success, the Complainant also became a Teen Parent Services Case Manager, which required that she case manage pregnant teens and teen parents, as well as conduct workshops and home visits.

These are duties the Complainant performed and responsibilities she carried out since her time with the Respondent, which are related and 'comparative' to what McKinzie handled as a Public Health Nurse II and Coordinator prior to her demotion. Thus, the Commission concludes that the Complainant did establish a *prima facie* case of race discrimination at the hands of the Respondent.

Next, ALJ Robinson concluded that the Respondent articulated a legitimate, nondiscriminatory reason for its adverse employment decision, namely, a need to reorganize the nurses within the agency to provide better specialized training, as well as a need to economize through the elimination of the Complainant's Coordinator position and the assumption of Complainant's supervisory duties by the Director of Nursing. [Citations.]

However, the Commission does not concur with ALJ Robinson that the Respondent articulated a legitimate non-discriminatory reason for its adverse action but said reason may be pretextual for race discrimination at the Complainant's cost. Pursuant to the Complainant's successful work history with the Respondent, and

- 17 -

the various academic degrees she attained during her tenure, coupled with the variety of experiences and roles she successfully undertook during her time with the Respondent, many of which delineated in the posted job vacancy notices the Respondent posted for the Nursing Services Manager and Public Health Nurse II positions, to eliminate the Complainant's Coordinator Nurse position, demote her back to a Public Health Nurse I role with a cut in her salary without cutting the salary of any other nurse demoted to a lower role is pretextual for race discrimination."

¶ 71 The order concluded by reiterating that it did not adopt the ALJ's recommendations and found that Hunt established a *prima facie* case. The Commission remanded the case back to the ALJ for a hearing on damages.

¶ 72 4. *Subsequent Proceedings*

¶ 73 In October 2020, the ALJ issued a supplemental ROD. We note that the ALJ did not conduct a new hearing because evidence of damages was provided at the prior hearing. In the supplemental ROD, the ALJ questioned the validity of the remand order, arguing that the tenures of the commissioners who signed the order had expired prior to its entry. Additionally, one of the commissioners that signed the order was not the same commissioner who heard the oral arguments. The ALJ further questioned the reasoning of the remand order, contending it conflicted with prior Commission precedent and was inconsistent with the evidence presented.

¶ 74 The ALJ recommended a new panel of commissioners hear the case and reconsider its prior decision for the reasons stated in the supplemental ROD. Alternatively, the ALJ made findings as to the damages and costs to which Hunt was entitled.

¶ 75 Hunt filed exceptions to the supplemental ROD, and the District filed a response.

In January 2020, the Commission, on its own motion, *sua sponte* struck the supplemental ROD in a written order. That order stated as follows:

> "The Commission has reviewed [the panel's] Remand Order decided on July 17, 2017[,] and entered on May 29, 2019, and the Commission rejects ALJ Robinson's [supplemental] ROD in its entirety as noncompliant and inconsistent with the Remand Order. The Commission does not reach the merits of the arguments in ALJ Robinson's [supplemental] ROD, will not provide any further clarification or justification for the Remand Order or [the panel's] authority to enter it, and will not take any of the actions ALJ Robinson recommended relating to the Remand Order."

¶ 76    The panel ordered that "the Remand Order from July 17, 2017[,] and entered on May 29, 2019[,] stands. As Complainant established a violation *** by a preponderance of the evidence, ALJ Robinson is ordered, again, to determine damages."

¶ 77    In February 2020, the ALJ issued a second supplemental ROD, awarding Hunt $7629 in back wages, $22,806.25 in legal fees, and $674.97 in costs. Neither party filed exceptions, and in June 2020, the Commission sent out a notice explaining that the second supplemental ROD had become the final order of the Commission as a result.

¶ 78                        B. The Failure to Promote Case

¶ 79    Hunt alleged that in 2005 and 2006, she twice applied for a nursing services manager position and twice applied for a public health nurse II position. The District hired four white applicants for those positions. Hunt asserted that she was qualified for those positions and she was not promoted because of her race.

¶ 80    The District denied that race played a part in its hiring decisions. Regarding the nursing services manager positions, the District asserted that (1) Hunt was not a qualified candidate

- 19 -

because she did not have sufficient relevant experience and (2) the District hired the most qualified candidates. Regarding the public health nurse II positions, the District conceded that Hunt was qualified but likewise maintained that it hired more qualified candidates.

¶ 81                                  1. *The Administrative Hearing*

¶ 82           In June 2012, the ALJ conducted an evidentiary hearing. Hunt presented testimony on her own behalf and from Charlene Stevens, a fellow long-time public health nurse with the District. The District presented testimony from several witnesses who were involved in the interviewing and hiring process. The ALJ admitted into evidence (1) the job postings, (2) the job descriptions and qualifications, (3) the applicants' resumes, and (4) the interviewers' notes and evaluations. All of the witnesses denied that race was discussed or considered as part of any of the interviews or hiring decisions.

¶ 83           The evidence generally showed the following.

¶ 84                       a. Hiring of the Nursing Services Manager Position

¶ 85           In the fall of 2005, the District advertised that it was hiring for a nursing services coordinator position. (We note that this position was subsequently renamed nursing services manager but was functionally identical.) The job posting provided as follows:

> "The Coordinator will be responsible to develop, plan, coordinate, evaluate & monitor standard nursing practices, protocols, procedures & services. Candidates should have a demonstrated ability to develop outcome-based performance standards, provide recommendations to directors on nursing, clinical, medical & privacy protocols & programs, conduct training for all staff on medical, nursing & privacy related matters."

The job posting further provided that candidates were required to have a bachelor's degree in

nursing or a closely related field, a current license as an RN, and "[f]ive y[ea]rs exp[erience] in nursing programs eval[uation], quality assurance, nursing performance measurement, development of nursing protocols & procedures or related exp[erience]."

¶ 86         Witnesses for the District testified that the District implemented a new process for interviewing candidates. The human resources department would gather the candidates' resumes. Then, a panel of interviewers, comprised of directors and their program coordinators in the relevant divisions, reviewed the resumes and compared them to the job descriptions for the posted position. The panel would ask each candidate questions from a prewritten list of questions. The interviewers would score the candidates' responses on a scale of one to three, based on how well the interviewer thought the candidate answered. The scores were then totaled, and the panel discussed which candidates it believed were best suited for the position. The candidate with the highest score was offered the position.

¶ 87         In 2006, Brandon Meline, Julie Pryde, and Larry Rodgers were all division directors, and all served on the interview panel for the nursing services manager position. They testified that the District was looking for a nursing services manager to write standard practices and procedures for all of the nurses in the District to ensure those nurses were following best practices in the nursing profession. They further testified that hospital and clinical experience were important for the position.

¶ 88         Rodgers testified the District was "pretty weak in terms of written established protocols that exposed them to risk management issues." He believed the best candidate would have (1) a breadth of experience in a variety of settings of the nursing practice, (2) extensive experience in supervising nurses, and (3) experience writing policies relating to risk management and setting up standard procedures. Moreover, Rodgers thought experience in the hospital setting

was valuable for developing standard protocols because hospitals have "a certain way that you do pretty much everything, and it's written, and the skills are verified and monitored pretty closely." The District was looking for something similar.

¶ 89        Pryde and Meline also testified that the District wanted someone who could develop necessary competencies, train nurses, and periodically evaluate them for those competencies. (We note that "competencies" referred to a nurse's ability to properly perform various clinical tasks on patients at a minimum skill level.) This was necessary because there was no clinical supervision of the nursing staff, and no training, to make sure they were able to perform all of the clinical components of public health nursing.

¶ 90        Pryde explained that because each division was going to have nurses and the agency was getting bigger, the nursing services manager would need to be able to supervise and evaluate all of the nurses in each division to ensure that the nurses were competent at their nursing functions and following best practices. This would require broad experience as it would include evaluating for competencies on tasks ranging from performing pelvic exams, to drawing blood, giving shots, and working with microscopes. Pryde testified that she also wanted the nursing services manager to be familiar with the (1) Occupational Safety and Health Act of 1970 (OSHA) (29 U.S.C. § 651 *et seq.* (2018)) standards and (2) Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. § 201 *et seq.* (2018)). Additionally, the District was expanding lab services and needed someone to implement the Clinical Laboratory Improvement Amendments of 1988 (CLIA) (42 U.S.C. § 201 *et seq.* (2018)) standards, which included calibrating machines and training staff.

¶ 91        Pryde and Meline both believed that hospital experience was preferable because hospitals had the highest standards of care and were heavily regulated. Meline further explained

that nurses in hospitals were using clinical skills every day, while public health nurses—who performed mainly case management—may go months without giving an injection. He testified that hospital experience was "significantly" considered because the District "needed to solidify policies and evaluation criteria for competencies, quality assurance type activities to make sure, you know, that we're following up and testing competencies and procedures on a regular basis." To accomplish this, Meline testified that the "real world clinical experience, working with providers in multi-disciplinary teams kind of in a clinical setting was important" to him as a panelist.

¶ 92        In sum, the testimony showed that the District's desired skillset for the nursing services manager position was primarily (1) writing standard operating procedures, (2) developing and performing competency assessments, and (3) experience managing, supervising, and training nurses.

¶ 93                                    i. *Sylvia Link*

¶ 94        In the fall and winter of 2005, the District interviewed Sylvia Link and Hunt, among others. Link's résumé showed that she had bachelor's and master's degrees in nursing and a Ph.D. in "Educational Leadership, Administration, and Foundations." Link began working as a nurse in 1992, and also had many years of experience teaching nurses at various colleges and universities, where she provided various levels of nursing students with classroom, laboratory, and clinical instruction. Link also managed, supervised, and evaluated both nursing students and licensed nurses for several years. She had three years of experience managing licensed nurses in (1) a mental health unit and (2) a Veteran Affairs health care center, which was multidisciplinary.

¶ 95        Link's interview notes reflected that the panel valued her knowledge of nursing competencies and practice standards, training in multiple disciplines, extensive background in

nursing education and evaluation, and experience developing policies and procedures. The interview notes further indicated that Link had experience with CLIA procedures. Meline testified he liked Link's breadth of experience as a nurse both in clinical settings as well as teaching and supervisory experience. Meline further liked her quality assurance, competency testing, and assessment experience. Meline also liked the fact that she had a Ph.D. and had experience writing protocols.

¶ 96　　　　Pryde remembered interviewing Link and believing she was the best candidate because "[s]he had a lot of experience doing the things we were looking for. The OSHA, the CLIA, the writing standard operating procedures, things like that, things that we needed to be—needed done." "She had a lot of experience writing—writing standard operating standards, and she knew all kinds of stuff about CLIA."

¶ 97　　　　Hunt's résumé showed that she joined the District in 1977. Hunt started in the Women, Infants, and Children program as a receptionist and later became a clerk typist. She got her RN in 1991 and began working in infectious diseases as a clinical nurse, which involved some lab work. In 1995, she moved to HealthWorks and worked as a case manager for three years, working with high-risk infants and families. In 1998, she earned her bachelor's degree in nursing and moved to community health nursing. She was a case manager at Teen Parent Services, worked with the Illinois Breast and Cervical Cancer Program updating grants, and ran the Heart Smart for Women program, which focused on teaching low income and African American women to be more health conscious with diet and exercise. Hunt also began the lead program, a grant program she ran that required her to develop policies and procedures to comply with the grant. In 2002, Hunt received a master's degree in public administration.

¶ 98　　　　Hunt's résumé further showed that from November 2003 to November 2004, she

was the program coordinator for community health nursing, in which she supervised, managed, and evaluated several nurses and some staff in the vision and hearing division. In that role, Hunt was on several committees that interviewed, hired, and fired personnel. For several months, first in 2004 and then again in 2005, Hunt was the interim director of nursing, which required her to be in charge of the community nursing and clinical services division, including the Illinois Breast and Cervical Cancer Program, clinical services, vision and hearing, and the community nursing division. In 2005, Hunt began teaching certified nursing assistant (CNA) students at Parkland College.

¶ 99        The interview notes explained that Hunt was marked down because she had no hospital experience, had only one year experience of supervising nurses, had not developed a quality control plan, and had limited experience with HIPAA and no experience with CLIA. Hunt also gave short, general, and nonspecific answers to questions and became argumentative when discussing why the nursing services manager position had changed.

¶ 100        Meline remembered Hunt had a long history working in various positions at the District. However, Meline noted that she had limited clinical experience, particularly outside of the public health context, especially compared to Link. Meline stated that the difference in ability to write policies and test competencies were also reasons Link was chosen over Hunt.

¶ 101        In January 2006, the District hired Link. Just 2½ months later, Link resigned from her position because her husband got a new job and her family had to relocate.

¶ 102                                    ii. *Jamie Perry*

¶ 103        In March 2006, the District posted substantially the same job opening for a nursing services manager, but this time specifically requested candidates have experience with OSHA, CLIA, and HIPAA. The posting did not state that hospital experience was necessary or preferred.

The District also added new requirements to the interview process because, according to Pryde, Link "wasn't very good at writing." Pryde testified that the District was happy with Link's teaching "and getting the stuff down, but we actually needed written standard operating procedures, and so we put that in there to see if—you know, to make sure that somebody actually could write." For the spring 2006 interviews, the District required applicants to perform two writing exercises and leave a voicemail that complied with HIPAA. One of the writing exercises was to write a protocol for giving an immunization of the candidate's choice.

¶ 104     In May 2006, the District again interviewed Hunt and also Jamie Perry. Perry had been a staff nurse with the University of Illinois McKinley Health Center since 1995. Perry previously served as the director of an emergency department for 2½ years and as a nurse manager in an emergency department at a local hospital for two years. Before that, she was a head nurse and responsible for training and supervising nurses for 11 years.

¶ 105     Perry's résumé showed that she had many years of experience (1) writing nursing standard practices, (2) training nurses, (3) supervising nurses, and (4) evaluating nurses' performance. She also had extensive administrative experience with OSHA and HIPAA. The interview panel noted that Perry had a broad knowledge base and a balance between clinical, trauma, and emergency experience and management. The panel believed Perry would be a good bridge between staff and management at the District.

¶ 106     Rogers remembered Perry's interview "very clearly" "because she was such an outstanding candidate" and "impressed [him] a lot." Specifically, Rogers was impressed by her relaxed presence in the interview and that she "exuded a lot of confidence." Perry was professional and clear with her responses. Perry also had the background "on paper and in terms of what she discussed about the work that she had done that went down the list for me of these are the

characteristics that I'm looking for, this person has the experiences, the competence, and the training to do what it is that we're trying to get done." "What stood out for me was the breadth of environments that she had functioned in and the functions that she had carried out."

¶ 107        Meline testified that Perry had a lot of experience writing policies, performing assessments, and determining nursing competency, which was what the District was looking for. "[Perry] had a couple of decades of nursing experience. She had a strong—very strong clinical nursing management background. She had worked at various clinical entities in the area. *** [S]he had a long history of clinical nursing and clinical nursing management again with policy writing, competency, assessments. She had, you know, great skills for that position as well." "The breadth of experience, the managerial experience. [Perry] had several years of management experience in the nursing field, and just those experiences and again the clinical work from my perspective were—would make her a more valuable candidate [than Hunt and the other candidates] for the type of job function that we had in mind."

¶ 108        The interview notes and materials showed that Hunt was marked down for a lack of management experience and clinical practice. She also performed poorly on the written portion of the interview, misspelling words and needing editing for style, content, and grammar. Hunt's voicemail allegedly did not comply with HIPAA. By contrast, Perry's writing portion had no errors and needed no correction.

¶ 109        Meline testified that Hunt had no experience writing policies, procedures, and competencies in a hospital or clinical setting. Regarding Hunt, Rogers remembered that she did not have any experience with risk management or policy development.

¶ 110        In June 2006, the District hired Perry for the nursing services manager position.

¶ 111                        b. Hiring of the Public Health Nurse II Position

¶ 112        Also in June 2006, the District posted a job for public health nurse I and II. Witnesses for the District testified that they were looking for an APORS nurse and were interviewing for both positions at the same time. The purpose of the position was to follow up with infants who had spent time in neonatal intensive care by conducting home visits and performing physical assessments of infants and children. Hunt asked the person in charge of collecting applications to use the résumé she had just submitted for the June 2006 management position to apply for this position.

¶ 113        Cathy Ito testified she was the program coordinator for the maternal child health division. Ito had worked at a hospital in obstetrics for two years before coming to the District, where she worked as a case manager for DCFS children and APORS for several years before becoming a program coordinator. She participated in the interviews for the public health nurse I and II positions available in the summer and fall of 2006.

¶ 114        Ito considered hospital experience important because that "experience *** help[s] you to identify some of the very subtle signs and symptoms, and so that is very important." Ito explained, "[T]hat kind of experience you don't get it from books, you have to learn like in the— in the kind of acute unit to really—really learn from that." Ito believed APORS nurses in hospitals had experience that would help parents to communicate with doctors. If a nurse did not have hospital experience dealing with acute care, Ito believed that would make it harder for an APORS nurse to perform well at public health. "If you only have Public Health without acute unit experience, that will hinder some of the assessment skills."

¶ 115        In June 2006, the District interviewed just one candidate, Ellen Weise, who had 19 years of experience working with high-risk infants in a neonatal intensive care unit (NICU). She also had experience teaching and educating parents about how to care for themselves and infants

and about the developmental needs for neonatal infants. Meline testified that he found important Weise's 8 to 10 years of experience in perinatal care, postpartum care, and emergency NICU because the APORS nurse would deal with high-risk infants. Weise was offered the position of a public health nurse II even though she interviewed for a public health nurse I because of her level of experience.

¶ 116     Weise accepted the position but left the District after just a few of months to return to hospital work.

¶ 117     In August 2006, the District posted another job vacancy for the same public health nurse II position. In addition to a panel interview with standard questions, the District again had the candidates perform a writing test. The District interviewed Hunt and Andrea Taylor.

¶ 118     Taylor was currently working as a public health nurse I with the District. The interviewers noted that Taylor had very applicable work experience due to her pediatric home health experience working with medially and developmentally at-risk children. She interviewed well and had over 10 years of experience in acute, pediatric hospital settings. She also had strong nursing technique and assessment skills. Ito testified that Taylor was working with a pediatrician at the District when she was interviewed and, in that role, was performing both clinical services and home visits.

¶ 119     Hunt was not highly thought of because she had no clinical pediatric or high-risk medical experience and no applicable clinical experience. Hunt lacked acute pediatric training compared to the other applicants. Ito did not recall if or how much experience Hunt had with APORS but knew both Weise and Taylor had much more experience, as well as hospital experience. It was Hunt's lack of "acute unit experience" that made her a less qualified candidate.

¶ 120                    c. Other Relevant Testimony

¶ 121                                    i. *Larry Rogers*

¶ 122          Rogers testified that the administrator of the District in 2006 was Vito Palazzolo. Rogers reported directly to Palazzolo and was in meetings with him weekly. Rogers described Palazzolo's "style of management was terror *** if you keep people in enough fear and you make them afraid of you, you will get what you want." Rogers testified that he left his job because he was experiencing adverse health consequences resulting from the stress of working with Palazzolo every day.

¶ 123          Rogers testified that Palazzolo was hostile towards the community nursing staff, and he opined that Palazzolo would have liked Hunt to be fired but he never asked Rogers to do so. Hunt "was one of the most visible in terms of her opinion, and assertiveness is why I would think" that Palazzolo wanted Hunt fired. "[I]f Vito had a hit list, she would have probably made the top ten." Rogers denied hearing Palazzolo make racially motivated statements about Hunt.

¶ 124                                    ii. *Patricia Hunt*

¶ 125          In rebuttal, Hunt testified about her work experience in the areas valued by the interviewers—namely, evaluating nursing competencies and compliance with OSHA, CLIA, and HIPAA. Hunt maintained that she worked with prior directors of nursing on "develop[ing] the proficiencies for the competency skills test" used in hiring nurses. She further maintained that she did chart reviews to make sure nurses were keeping correct records and frequently attended trainings through the Illinois Department of Public Health. Hunt also testified that she was trained in CLIA and tested for competencies on related lab work. She then implemented that training when working in the STD division. She updated the policies and procedures for the lead program, which she managed.

¶ 126          Hunt testified that the nursing services manager position was actually lower,

organizationally, than the director of nursing position she twice performed for the District. Hunt maintained that she had actually performed all of the job functions of the nursing services manager at the District, which no other candidate had done.

¶ 127 Regarding the APORS nurse (public health nurse II) position, Hunt testified at length about the diversity of her experience handling APORS cases as well as those similar to APORS, like pregnant teens, STD clients, and the elderly. She believed her experience actually performing the public health job was more valuable than hospital experience because hospital nurses only dealt with newborns and did not follow infants as they grew older. (Hunt called Charlene Stevens who testified to substantially the same.)

¶ 128 Hunt believed she was discriminated against based on race because Staci Rossman told Hunt that the District administrator said Hunt would not get a promotion no matter what she applied for. Hunt's experience of applying for positions she was clearly qualified for and not being hired lined up with that statement. Further, she had actually worked as the director of nursing, she had held every nursing position in the District, and she had performed all of the tasks listed in the job descriptions. She also commented that the District had a long history of hiring people directly out of college, like Meline, among others, and promoting them up with minimal qualifications and limited experience, again like Meline.

¶ 129 iii. *Charlene Stevens*

¶ 130 Stevens testified that she worked at the District as a community health nurse for several years and had performed APORS work. Before that, she worked in a hospital setting. Stevens agreed with Hunt that experience working with APORS as a nurse in a hospital was not very valuable because those nurses only dealt with newborns while public health nurses followed their APORS children up to age two. Stevens further testified that the District did not have periodic

evaluations, which she found surprising because, in the hospital setting, Stevens was repeatedly and periodically evaluated on competencies.

¶ 131                                    iv. *Julie Pryde*

¶ 132        Pryde testified that the yearly performance evaluations of employees did not test for skills or competencies. Instead, job performance related to behavior at work, such as timeliness and getting along with others.

¶ 133                                    2. *The ALJ's ROD*

¶ 134        In February 2015, the ALJ entered a written ROD finding Hunt had failed to establish a *prima facie* case of racial discrimination in failure to promote. Specifically, the ALJ looked extensively at the resumes, interview notes, and scores entered in the record and compared Hunt to the applicants who had been awarded the positions. The ALJ found that Hunt did not have the necessary five years of supervisory experience required for the nursing services manager position. Further, Link and Perry had far more supervising experience and clinical experience. Because Hunt did not establish that she was the most qualified applicant, she did not show race discrimination.

¶ 135        The ALJ further wrote the following:

> "Complainant, though, notes that she was qualified for the Nursing Services Manager position because she served as Respondent's Interim Director of Nursing for a period of months, as well as served in a Coordinator's position that called for some supervision of nurses as well. *** However, Respondent's witnesses explained that: (1) the Nursing Services Manager was going to be performing essentially new duties that had not been performed before that called for the drafting and implementation of nursing protocols and procedures, as well as the continual

testing of Respondent's nurses as to such protocols and procedures to ensure that all nurses were performing in a competent manner; and (2) the performance evaluations that had been performed by the Director of Nurses did not essentially test nurses on their competency to perform their nursing skills on an ongoing basis." The ALJ noted that even Hunt's witness, Stevens, testified about the lack of competency evaluations.

¶ 136 Regarding the public health nurse II position, the ALJ agreed that Hunt made a *prima facie* case that she was qualified for the position and white applicants were selected over her. However, the ALJ believed the District had set forth a legitimate, nondiscriminatory reason for hiring Weise and Taylor—namely, they were more qualified. The résumés and interviews demonstrated that Weise and Taylor were more qualified for the position, and Hunt did not present any evidence of pretext.

¶ 137 The ALJ recommended that Hunt's claim be dismissed.

¶ 138                              3. *The Remand Order*

¶ 139 Hunt filed written exceptions to the ALJ's ROD, and the District filed a response thereto. The Commission agreed to review the case.

¶ 140 In January 2017, the Commission reviewed the case. The minutes of that meeting, approved March 14, 2017, indicated that the panel (Fakroddin, Hartman, and Gash) voted to reject the ALJ's ROD and remand the case for a determination of Hunt's damages.

¶ 141 In May 2019, the Commission issued its remand order, signed by Fakroddin, Hartman, and Gash, indicating that the commissioners had voted during their terms. The Commission, like the ALJ, summarized the résumés and interview notes of Hunt and the people hired for each position: Link, Perry, Weise, and Taylor. The Commission pointed out that the

District was very critical of Hunt's interviews, writing samples, and lack of experience. Meanwhile, the District praised the other applicants on these same metrics.

¶ 142    The Commission rejected the ALJ's findings that Hunt failed to establish (1) a *prima facie* case of race discrimination for the nursing services manager position and (2) the qualifications rationale was pretext for racial discrimination.

¶ 143    The Commission noted that in its ROD, the ALJ stated that Hunt needed to demonstrate that her qualifications "were at least 'not inferior' " to those of the successful applicants. The Commission rejected that view and wrote the following:

> "However, the Commission does not agree with ALJ Robinson's assessment of the improper application of the *McDonnell Douglass* [*sic*] standard establishing a *prima facie* case of race discrimination. Here, the Commission determines that the Complainant did, in fact, establish a *prima facie* case of race discrimination. In assessing the Complainant's long tenure with the Respondent, the Commission finds that the Complainant was more than qualified for the Nursing Services Manager position, as well as the Public Health Nurse II role. For example, the Commission has examined the Complainant's history with the Respondent and learned that during her tenure with the Respondent, the Complainant achieved great academic success by earning her RN license in May 1991, her bachelor's degree in Nursing in 1998, and a master's degree in Public Administration in 2002.
>
> During these years, the Complainant handled various nursing-related activities, including, but not limited to, service as a case manager with the children in the Adverse Pregnancy Outcome Reporting System ('APORS') where she made periodic visits to the homes of high-risk infants; service as a Public Health Nurse

in the Community Health Nursing Department where she made home visits to elderly residents in an effort to assist them in remaining in their homes; handling additional duties in the Heart Smart for Women Program, Illinois Breast and Cervical Cancer Program, and the Lead Program. In addition to obtaining academic success, the Complainant also became a Teen Parent Services Case Manager, which required that she case manage pregnant teens and teen parents, as well as conduct workshops and home visit."

¶ 144    The Commission next addressed and rejected the ALJ's finding that the District provided a legitimate nondiscriminatory reason for not promoting Hunt—namely, that the District wanted to hire the most qualified candidate, and Hunt was not the most qualified.

"Pursuant to Complainant's history with the Respondent, and the various academic degrees she attained during her tenure, coupled with the variety of experience and roles she successfully undertook during her time with the Respondent, many of which were delineated in the posted job vacancy notices the Respondent posted for the Nursing Services Manager and Public Health Nurse II positions, the Commission concludes that the Complainant was the most qualified candidate for these positions, and the Respondent electing not to hire the Complainant for these employment opportunities based on the reason articulated was pretext for race discrimination."

¶ 145    After finding in favor of Hunt, the Commission remanded the case for the ALJ to determine damages.

¶ 146                    4. *Subsequent Proceedings*

¶ 147    Just as in the demotion case, on remand in the failure to promote case, the ALJ

- 35 -

issued a supplemental ROD questioning the commissioners' authority to enter the remand order. Likewise, in January 2020, the Commission *sua sponte* entered a nearly identical order vacating the ALJ's supplemental ROD, reaffirming its remand order, and ordering the ALJ to determine damages.

¶ 148     In February 2020, the ALJ entered a second supplemental ROD awarding Hunt $40,987 in back wages, $28,275 in attorney fees, and $2822.06 in costs. Because neither party filed any exceptions to the second supplemental ROD, the Commission sent a notice in June 2020, informing the parties that the second supplemental ROD had become the order of the Commission.

¶ 149     The District then sought direct administrative review of both cases in this court.

¶ 150                    III. ANALYSIS

¶ 151     The State argues that this court lacks jurisdiction to review the Commission's orders because the District did not exhaust its administrative remedies. Alternatively, the State argues that the Commission's findings were not against the manifest weight of the evidence.

¶ 152     The District, meanwhile, argues that the Commission's remand orders are void because they bear the signatures of commissioners whose terms had expired when the orders were issued. In the alternative, the District contends the Commission's findings were against the manifest weight of the evidence in each case because Hunt failed to (1) establish a *prima facie* case of race discrimination and (2) demonstrate that the District's legitimate, nondiscriminatory reasons for taking actions against Hunt were a pretext for race discrimination.

¶ 153     We address each argument in turn and conclude as follows: (1) the State has not demonstrated that the District failed to exhaust its administrative remedies, (2) the Commission's remand orders were valid, (3) the Commission's finding of race discrimination in the demotion case was not against the manifest weight of the evidence, and (4) the Commission's finding in the

failure to promote case was against the manifest weight of the evidence.

¶ 154                    A. Exhaustion of Remedies

¶ 155        The State argues that the District failed to exhaust its administrative remedies by not filing exceptions to the ALJ's damages awards. It is well settled that, generally, a party may not seek judicial review of an administrative decision "without first pursuing all available administrative remedies." *Goral v. Dart*, 2020 IL 125085, ¶ 37 (citing *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 308, 547 N.E.2d 437, 439 (1989)). The State claims the District was required to file exceptions to both the liability findings (the ALJ's original RODs) and the damages awards (the second supplemental RODs after remand). However, the District filed exceptions only to the former and not the latter. Because the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2018)) and the Commission's procedural regulations contained in the Illinois Administrative Code (see 56 Ill. Adm. Code 5300) say that if no exceptions are filed, then the decision is not subject to review, the State asserts that the District's failure to file any exceptions to the damages awards means administrative remedies were not exhausted.

¶ 156        We disagree. The Act and the associated regulations demonstrate that exceptions were not required to preserve earlier adjudicated liability findings after the ALJ's supplemental orders on damages following remand. Further, the Act and regulations do not provide for a way to challenge the Commission's findings as to liability only. And the purposes of the exhaustion requirement are not served by requiring a party to file exceptions in this case, as demonstrated by analogous situations in civil practice generally.

¶ 157        First, the Act and regulations do not support the State's position. True, both the Act and regulations say that if a party does not file exceptions to an ALJ's ROD, then that ROD shall become the decision of the Commission without further review. 775 ILCS 5/8A-103(A) (West

- 37 -

2018); 56 Ill. Adm. Code 5300.910 (1996). However, the regulations also provide for limited remand proceedings (56 Ill. Adm. Code 5300.1040 (1985)) and the filing of responses to exceptions (56 Ill. Adm. Code 5300.930 (1992)), as does the Act (see 775 ILCS 5/8A-103(B) (West 2018)).

¶ 158    Paragraph (B) of section 8A-103 of the Act provides that a party may file responses to exceptions within 21 days. *Id.*; 56 Ill. Adm. Code 5300.930 (1992). Paragraph (E) then provides that the Commission shall consider the ALJ's ROD, any exceptions, and any responses thereto. 775 ILCS 5/8A-103(E) (West 2018). Accordingly, the filing of a response may be sufficient to preserve an issue for appellate review. See *Williamson v. Asher*, 2013 IL App (1st) 122038, ¶ 23, 993 N.E.2d 967 (concluding the plaintiff preserved an issue for review by raising it in her response brief before the trial court); see also *Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 22, 7 N.E.3d 729 ("[Plaintiff's] responsive briefing [in the trial court] was sufficient to preserve the issue for our review."); *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2021 IL App (1st) 200894, ¶ 60.

¶ 159    Section 1040 of the regulations, providing for remands to an ALJ, further supports our conclusion. That section provides that the Commission may (1) remand a case, in part, to an ALJ and (2) determine the scope of the remand proceeding. See 56 Ill. Adm. Code 5300.1040 (1985) (stating if a remand is deemed necessary, the Commission "shall specify the nature and scope of the proceedings to be had"). The ALJ then must conduct a further hearing in accordance with the Act (775 ILCS 5/8A-103(D) (West 2018)) and the regulations (56 Ill. Adm. Code 5300.1040 (1985)). The exception requirement is likewise applicable on remand. 775 ILCS 5/8A-103(D) (West 2018).

¶ 160    Here, because the ALJ originally issued RODs finding in favor of the District, the

District had no reason to file exceptions. However, after Hunt filed exceptions, the District filed responses to those exceptions as provided in the Act and implementing regulations. *Id.* § 8A-103(B). The District's written responses contain all of the same arguments it now makes on appeal to this court. The Commission agreed to review the RODs and heard oral arguments from the parties on them. The Commission then reversed the ALJ's findings, found in favor of Hunt on the issue of liability, and remanded the cases to the ALJ for the limited purpose of determining damages.

¶ 161　　　　The Act makes clear that the District could have filed an application for rehearing, but it was not required to do so in order to exhaust its remedies. See *id.* § 8A-103(F)(1) ("The failure to file an application for rehearing shall not be considered a failure to exhaust administrative remedies."). On remand, the ALJ was not free to reexamine the Commission's liability findings because the Commission had limited the scope of the remand proceedings to determining damages. Indeed, when the ALJ *did* revisit the issue of liability and the Commission's authority to enter its remand orders, the Commission *sua sponte* vacated the ALJ's supplemental RODs because they were not authorized by the remand orders.

¶ 162　　　　When the ALJ issued its second supplemental RODs on damages, the District was not required to reraise the issue of liability by filing exceptions despite not having any complaints about the damages determinations. Had the District attempted to do so, the Commission could have and should have rightly declined to consider the issue of liability because that issue had already been decided. Instead, the District had two options for challenging the Commission's liability findings against it. First, the District could have asked for a rehearing of the Commission's earlier remand orders, which was not required to exhaust its remedies. Second, it could have sought judicial review in this court but only after the damages awards were entered; the District could not

have sought judicial review of the liability findings and remand orders when the Commission entered them because they were not final orders. The District chose the second option and sought judicial review once the Commission entered final orders. The District is not barred on appeal from raising the same arguments it raised in its responses to Hunt's exceptions to the ALJ's RODs finding in the District's favor.

¶ 163 This result becomes immediately clear when one considers the inverse of the circumstances in this case. Suppose the ALJ had initially found liability in favor of Hunt. In that case, it would have entered an ROD setting forth its findings as to liability *and* damages. Suppose further that the District filed exceptions and Hunt filed responses. If the Commission reversed the ALJ and found in favor of the District, Hunt could not then file exceptions to the *Commission*'s decision; exceptions can only be filed against an ALJ's findings. See *id.* § 8A-103(A). And, by statute, Hunt would not be required to seek rehearing. *Id.* § 8A-103(F)(1). In this circumstance, it would be absurd to suggest that Hunt could not, on appeal, make the same arguments she made to the Commission merely because she did not file any exceptions to the ALJ's ROD in Hunt's favor.

¶ 164 Indeed, many cases follow this fact pattern. See, *e.g.*, *Irick v. Human Rights Comm'n*, 311 Ill. App. 3d 929, 933-34, 726 N.E.2d 167, 171 (2000) (ALJ recommended finding for the employee and set damages; the Commission reversed, and the employee appealed); *Clark v. Human Rights Comm'n*, 312 Ill. App. 3d 582, 586, 728 N.E.2d 582, 586 (2000) (same); *Milan v. Human Rights Comm'n*, 169 Ill. App. 3d 979, 982-83, 523 N.E.2d 1155, 1157-58 (1988) (same).

¶ 165 To the extent the State claims exceptions to damages findings after remand orders present a unique situation, we disagree. For example, although exhaustion was not raised as an issue, several other cases follow the fact pattern in this case. *Chas. A. Stevens & Co. v. Human Rights Comm'n*, 196 Ill. App. 3d 748, 753, 554 N.E.2d 976, 979 (1990) (Commission reversed and

remanded for a damages hearing and then affirmed the damages award); *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 375 Ill. App. 3d 834, 841-42, 875 N.E.2d 10, 16 (2007) (same); *All Purpose Nursing Service v. Human Rights Comm'n*, 205 Ill. App. 3d 816, 821-23, 563 N.E.2d 844, 847-48 (1990) (same); *Warren v. Illinois Human Rights Comm'n*, 2021 IL App (5th) 200289-U, ¶¶ 16, 21, 24-25 (oddly similar fact pattern to the one in this case); see also *Pinnacle Ltd. Partnership v. Human Rights Comm'n*, 354 Ill. App. 3d 819, 825-26, 820 N.E.2d 1206, 1211-12 (2004) (the Commission reversed the ALJ's liability finding, the employer appealed, and on appeal, this court did not mention damages at any point in its opinion). The prevalence of these cases suggests that there is nothing unique or different about cases that result in remands instead of outright reversals. If exceptions to the damages awards were required as the State claims, we would expect to have seen a court of review addressing that issue before now.

¶ 166        By comparison to civil cases, the reasons why the District did not have to file an exception are well established. In civil cases, making an argument in a response brief submitted to the trial court is sufficient to preserve it for review. See, *e.g.*, *Huang*, 2014 IL App (1st) 123231, ¶ 22. And when a trial court enters summary judgment on liability and then conducts a jury trial on damages, a posttrial motion is not required to preserve the issues raised in the summary judgment proceedings. *Mohn v. Posegate*, 184 Ill. 2d 540, 547, 705 N.E.2d 78, 81 (1998) ("[A] party need not raise in a post-trial motion any issue concerning the pretrial entry of summary judgment as to part of a cause of action in order to preserve the issue for review."). Because the issues raised at summary judgment are purely legal and are fully considered by the trial court, nothing about the damages proceedings affects the court's prior analysis on liability. *Id.* at 546. Accordingly, the only thing preventing the losing party from appealing is the lack of a final order. Such is the case here.

¶ 167 And this conclusion makes sense. The purposes of the exhaustion requirement have been fulfilled when, as here, the Commission (1) makes a finding based upon the arguments of both the parties and the recommendations of the ALJ as to the issue of liability and (2) remands the case for the limited purpose of determining the separate issue of damages. In *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 308, 547 N.E.2d 437, 439 (1989), the Illinois Supreme Court wrote the following:

> "Requiring the exhaustion of remedies allows the administrative agency to fully develop and consider the facts of the cause before it; it allows the agency to utilize its expertise; and it allows the aggrieved party to ultimately succeed before the agency, making judicial review unnecessary. [Citations.] The doctrine also helps protect agency processes from impairment by avoidable interruptions, allows the agency to correct its own errors, and conserves valuable judicial time by avoiding piecemeal appeals."

¶ 168 Here, the District raised all of the arguments in support of a finding in its favor before both the ALJ and the Commission. Accordingly, the Commission had the opportunity to fully consider those arguments, apply its expertise to the case, and correct any mistakes by the ALJ. And the Commission did just that, reversing the findings of the ALJ because they were against the manifest weight of the evidence and remanding to the ALJ to consider the separate issue of damages for the first time. The damages proceedings did not have any effect on the liability finding, nor could they. When the ALJ revisited liability, the Commission *sua sponte* vacated the ALJ's orders, examined its prior remand order, and reaffirmed that order, again remanding the case for damages awards.

¶ 169 The purposes of the exhaustion requirement would be defeated if the District and

other similarly situated litigants before the Commission were required to reassert arguments pertaining to liability by filing exceptions to a damages award that was entered after remand from an adverse liability finding by a Commission that rejected those same arguments in the first place. Such a requirement would extend litigation and impose greater costs by forcing the agency to spend valuable resources relitigating issues already decided by the same panel of commissioners that entered the remand order even though the party filing the exceptions takes no issue with the damages proceedings and would not otherwise seek further agency review.

¶ 170        The proceedings in this case have already taken years, and requiring the filing of exceptions in these circumstances would extend them even further. No justification for such a requirement exists, considering that the District takes no issue with the damages proceedings.

¶ 171        This court would not tolerate a litigant who, after a remand for further limited proceedings, attempted to raise issues already decided regardless of whether that party filed a petition for rehearing earlier.

¶ 172        Accordingly, we conclude that the District exhausted its remedies as to the liability determination by timely filing responses to Hunt's exceptions with the Commission.

¶ 173        To be clear, the District is barred from challenging anything related to damages. However, the District does not raise any issues about damages.

¶ 174                B. The Validity of the Commission's Remand Orders

¶ 175        The District argues that the Commission lacked the authority to enter the 2019 remand orders because they were signed by commissioners whose terms had expired at the time the orders were signed. Even assuming the District were correct (a proposition we highly doubt but need not consider), the Commission reaffirmed its prior remand orders in January 2020.

¶ 176        "While it is a jurisdictional requirement that three commissioners form a panel to

hear oral arguments and a majority of that panel approve the resulting order, the writing and filing of the Commission's order is a ministerial act and does not impact the jurisdictional validity of the Commission's ruling." *Dig Right In Landscaping v. Illinois Workers' Compensation Comm'n*, 2014 IL App (1st) 130410WC, ¶ 25, 16 N.E.3d 739 (citing *Zeigler v. Industrial Comm'n*, 51 Ill. 2d 137, 142, 281 N.E.2d 342, 345 (1972)); see also *Zeigler,* 51 Ill. 2d at 143 ("[T]here is no reason why these acts must be performed by a Commission composed of the same members.")).

¶ 177        Here, the record in each case demonstrates that the panel of the Commission that struck the ALJ's supplemental RODs and *reaffirmed* the original panels' votes and remand orders made those determinations while those commissioners were duly appointed. The District does not challenge the authority of the commissioners who signed the second remand orders to enter those orders. Nor does the District challenge the authority of the original commissioners who actually voted to reject the ALJ's RODs and remand the cases for damages proceedings. Accordingly, we conclude that the Commission's orders finding in favor of Hunt and against the District were valid.

¶ 178        C. Whether the Commission's Liability Findings Were Against the Manifest
                        Weight of the Evidence

¶ 179                            1. *The Applicable Law*

¶ 180                            a. The Standard of Review

¶ 181        When reviewing decisions from the Commission, "the reviewing court examines the actual determination of the Commission as if the Commission were the original fact finder." (Internal quotation marks omitted.) *Pinnacle Ltd. Partnership*, 354 Ill. App. 3d at 828. "[O]ur review of the Commission's decision is limited to determining whether it was against the manifest weight of the evidence." *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 142, 908 N.E.2d 39, 48 (2009). A finding is against the manifest weight of the evidence if no rational trier of fact could have agreed with the agency's decision (*Wal-Mart*

- 44 -

*Stores, Inc. v. Human Rights Comm'n*, 307 Ill. App. 3d 264, 267, 717 N.E.2d 552, 554 (1999)) or the opposite conclusion is clearly evident (*MIFAB, Inc. v. Illinois Human Rights Comm'n*, 2020 IL App (1st) 181098, ¶ 40, 164 N.E.3d 1252). " 'If the record contains any evidence supporting the Commission's decision, we must sustain the decision on review.' " *Sangamon County Sheriff's Department*, 233 Ill. 2d at 142 (quoting *Pinnacle Ltd. Partnership*, 354 Ill. App. 3d at 828).

¶ 182                               b. Reviewing Discrimination Claims

¶ 183          Illinois courts have accepted the three-part analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for establishing discrimination claims. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684, 687 (1989). The Illinois Supreme Court set out that analysis as follows:

> "First, plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that the employer unlawfully discriminated against plaintiff. Second, to rebut the presumption, the employer must articulate, not prove [citation], a legitimate, nondiscriminatory reason for its decision.
>
> Finally, if the employer carries its burden of production, the presumption of unlawful discrimination falls and plaintiff must then prove by a preponderance of the evidence that the employer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination." *Id.*

¶ 184          "Illinois courts have found it appropriate to examine federal decisions when construing the Act." *Sangamon County Sheriff's Department*, 233 Ill. 2d at 138 (finding it not appropriate in that case).

¶ 185                               2. *The Demotion Case*

¶ 186     The District argues that Hunt failed to establish a *prima facie* case because McKinzie was not a similarly situated employee. The District asserts that McKinzie and Hunt were in different divisions being supervised by different people performing significantly different functions. It further contends that their employment actions cannot be compared because they occurred 18 months apart. We disagree.

¶ 187                              a. The Applicable Law

¶ 188     First, the employee must establish a *prima facie* case of unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 178-79. To do so, the employee must establish by a preponderance of the evidence that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate business expectations, (3) she suffered an adverse employment action, and (4) the employer treated similarly situated employees outside of the class more favorably. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 919, 936 N.E.2d 623, 640 (2010). If the employee establishes a *prima facie* case, a rebuttable presumption arises that the employer unlawfully discriminated against the plaintiff. *Zaderaka*, 131 Ill. 2d at 179.

¶ 189     Second, to rebut that presumption, the employer must articulate a legitimate, nondiscriminatory reason for its decision. *Id.* "The employer has only the burden of production, not the burden of persuasion on this element." *Sola v. Human Rights Comm'n*, 316 Ill. App. 3d 528, 537, 736 N.E.2d 1150, 1157 (2000).

¶ 190     Third, if the employer articulates such a reason, the presumption of discrimination disappears, and the employee must prove by a preponderance of the evidence that the employer's reason was untrue and was a pretext for discrimination. *Zaderaka*, 131 Ill. 2d at 179. The burden of proving that the employer unlawfully discriminated against the petitioner remains with the petitioner at all times. *Id.* "The fact finder's disbelief of the reasons put forward by the employer

may, together with the elements of the *prima facie* case, suffice to show intentional discrimination." *Wal-Mart Stores, Inc.*, 307 Ill. App. 3d at 270 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

¶ 191　　　　The Second District recently set forth the definitive word on when an employee is similarly situated in *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 46, 127 N.E.3d 1056, in which it wrote the following:

"The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors. [Citation.]

There must be enough common factors…to allow for a meaningful comparison in order to divine whether intentional discrimination was at play. [Citation.] *** In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. [Citation.] This is not a magic formula, however, and the similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees. [Citation.]

Whether a comparator is similarly situated is usually a question for the fact-finder ***." (Internal quotation marks omitted.) *Id.*

¶ 192　　　　　　b. The Evidence Supporting the Commission's Finding

¶ 193　　　　The District argues that Commission's finding that McKinzie was a similarly situated comparator was against the manifest weight of the evidence. The District asserts McKinzie and Hunt were not supervised by the same person. Further, McKinzie was reclassified in July 2003

whereas Hunt was demoted in November 2004. We disagree.

¶ 194        McKinzie testified that King was her direct supervisor at some point in 2003 or 2004. Similarly, Hunt was frequently directly supervised by King. Further, although the timing was spread out, King was still the administrator during that period and made the decisions with respect to each employee after conferring with their division director. Additionally, both were performing similar work.

¶ 195        McKinzie was not demoted to her prior position in July 2003 because the District did not have the public health nurse I and II designations; it only had "public health nurse," and McKinzie was classified as one. Instead, McKinzie was reclassified as a public health nurse II, a *higher* position, because her workload increased. When Hunt was demoted in November 2004, she was performing job duties similar to the ones McKinzie was performing after her reclassification in July 2003. Just like McKinzie, Hunt's "demotion" was primarily about title and not about job responsibilities.

¶ 196        Hunt testified that she continued to perform all of the coordinator duties even after her November 2004 demotion. However, unlike McKinzie, Hunt *did* receive a decrease in salary and was returned back to her prior job title, public health nurse I, rather than to the job title that actually described the duties and responsibilities she was then performing, which, as the Commission found, amounted to a public health nurse II. Accordingly, McKinzie *was* a proper comparator and the Commission's finding was not against the manifest weight of the evidence.

¶ 197        The Commission identified the District's justification for demoting Hunt as cost savings and reorganization. True, by cutting Hunt's salary the District saved money. But the same is true any time an employer decreases an employee's salary. Cost savings, without more, is not a *per se* legitimate nondiscriminatory motivation.

¶ 198        Importantly, Hunt testified that she continued to perform all of the same duties she performed as program coordinator. Accordingly, the Commission could have concluded that the District's decision to reduce Hunt's salary was not motivated by a desire to decrease costs by eliminating redundancies.

¶ 199        The District argues that Hunt needed to do more than prove the reason for demoting her was pretextual. However, it is well settled that a fact finder may rely on the *prima facie* case and the evidence of pretext to find intentional discrimination. *Wal-Mart Stores, Inc.*, 307 Ill. App. 3d at 270. The same is true here. Because Hunt proved (1) her *prima facie* case and (2) that the elimination of her position was a pretext, the Commission was free to infer that race discrimination was a motivating factor in the decision.

¶ 200                    3. *The Failure To Promote Case*

¶ 201        The District argues the Commission erred by finding (1) Hunt was the most qualified applicant for the 2006 job openings and (2) Hunt proved the District's desire to hire the most qualified applicant was pretext for intentional race discrimination. The State and Hunt argue that the Commission's findings were not against the manifest weight of the evidence.

¶ 202        We agree with the District.

¶ 203                        a. The Applicable Law

¶ 204        "To establish a *prima facie* case of employment discrimination, a petitioner must show: (1) he is a member of a protected class; (2) he applied and was qualified for the position; (3) he was rejected despite his qualifications; and (4) the position remained open and the employer sought other applicants from persons of petitioner's qualifications." *In re C.R.M.*, 372 Ill. App. 3d 730, 733, 866 N.E.2d 1177, 1180 (2007). "An employer need not hire an applicant just because she is in a protected class if she is only equally or less qualified than an applicant who is hired."

*Stone v. Department of Human Rights*, 299 Ill. App. 3d 306, 315, 700 N.E.2d 1105, 1112 (1998). " 'Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.' " *Id.* (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). As a result, federal courts have held that the employee must prove "someone outside the protected class who was 'not better qualified' was hired instead" (*Barnes v. Board of Trustees of the University of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020)), and we agree that the same holding applies under Illinois law.

¶ 205 Under the *McDonnell-Douglas* framework, if the employer provides a legitimate, nondiscriminatory reason for its actions, the employee must prove the employer's reason is merely pretextual. *Zaderaka*, 131 Ill. 2d at 179. To do this, the employee must show the articulated reason (1) has no basis in fact, (2) did not actually motivate the employer's decision, or (3) was insufficient to motivate the employer's decision. *Sola*, 316 Ill. App. 3d at 537. The employee must do more than merely discredit the employer's stated reason and instead "must present sufficient evidence to permit a finding that the employer's proffered reasons masked intentional racial discrimination rather than some other legitimate, though not necessarily commendable, motive." *Christ Hospital & Medical Center v. Human Rights Comm'n*, 293 Ill. App. 3d 105, 111, 687 N.E.2d 1090, 1094 (1997). "[T]he plaintiff must present sufficient evidence to allow a jury to infer that [race] was a motivating factor in the employer's decision." *Sola*, 316 Ill. App. 3d at 538.

¶ 206 "[W]hether an employer's articulated reason is pretextual is a question of fact" and will not be reversed unless it is against the manifest weight of the evidence. *Zaderaka*, 131 Ill. 2d at 180. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *MIFAB, Inc.*, 2020 IL App (1st) 181098, ¶ 40.

¶ 207 b. The Commission's Finding That Hunt Was the Most Qualified Applicant Was
Against the Manifest Weight of the Evidence

¶ 208     For the purposes of our analysis, we accept the Commission's finding that Hunt met the qualifications for the nursing services manager position. The Commission's remand order was unclear regarding whether it found the District's asserted nondiscriminatory reason for not promoting Hunt was (1) not legitimate or (2) merely a pretext. We make clear that the District stated a legitimate, nondiscriminatory reason for failing to promote Hunt. Hiring someone who the employer believes is better qualified for the position is a legitimate, nondiscriminatory reason for action. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838-39 (7th Cir. 2009); *Barnes*, 946 F.3d at 389 (same).

¶ 209     As an initial matter, we note that the Commission appeared to be confused regarding the correct rule of law to apply in this failure to promote case. The ALJ relied on a Commission decision that required the claimant to show she was not "less qualified" than other applicants. The Commission rejected this formulation as against the *McDonnell-Douglas* framework and concluded that Hunt need not make such a showing. However, the Commission went further to find, as a factual matter, that Hunt *was* the most qualified applicant. Such a finding rendered the ALJ's legal standard irrelevant. This legal confusion gives this court pause over the soundness of the Commission's ultimate determination.

¶ 210     Nonetheless, as set forth above, we conclude that Hunt was required to show she was the most qualified applicant in order to prove her race discrimination claim. See *Stone*, 299 Ill. App. 3d at 315. Because the Commission found Hunt to be the most qualified applicant, we review that finding to see if it is against the manifest weight of the evidence. After an exhaustive review of the record, we conclude that the Commission's finding was against the manifest weight of the evidence. We cannot find any evidence in the record that would support the Commission's position, and the opposite conclusion, that Hunt was not more qualified than the other applicants,

is clearly evident.

¶ 211                                    i. *Nursing Services Manager*

¶ 212        The Commission determined that Hunt was the most qualified applicant based on her education and her prior experience at the District. In its remand order, the Commission wrote the following:

> "Pursuant to the Complainant's history with the Respondent, and the various academic degrees she attained during her tenure, coupled with the variety of experience and roles she successfully undertook during her time with the Respondent, many of which were delineated in the posted job vacancy notices the Respondent posted for the Nursing Services Manager and Public Health Nurse II positions, the Commission concludes that the Complainant was the most qualified candidate for these positions, and the Respondent electing not to hire the Complainant for these employment opportunities based on the reason articulated was pretext for race discrimination."

¶ 213        However, the entirety of the Commission's remand order reads as a detailed explanation for why the District believed Hunt was *not* the most qualified. The Commission sets forth Hunt's poor evaluations in interviews, poor writing skills, and lack of experience in the most important aspects of the job. Tellingly, nothing in the Commission's remand order contradicts the ALJ's findings—which are overwhelmingly supported by the testimony and documentary evidence—that Hunt did not have any experience (1) writing standard operating procedures, (2) developing or performing competency assessments, or (3) managing or supervising nurses more than a single year.

¶ 214        The District's witnesses repeatedly testified that the above three factors were the

most important aspects of the nursing services manager position. The entire point of creating the nursing services manager position was to develop and implement standard operating procedures and a quality assurance regime across all divisions of the District in order to comply with applicable laws, cultivate and foster best practices, and manage risk so the District could continue to expand and improve its quality of services for the community.

¶ 215        The Commission failed to point to any evidence in the record supporting Hunt's qualifications in these areas. As we are required, we have scoured the administrative record in an effort to locate "*any evidence* supporting the Commission's decision" but have come up empty. (Emphasis added and internal quotation marks omitted.) *Sangamon County Sheriff's Department*, 233 Ill. 2d at 142.

¶ 216        Certainly, one could argue that the District appeared to think Hunt was *capable* of fulfilling the duties of a nursing services manager. After all, just three months after concluding Hunt lacked the desired experience, the District nonetheless granted her another interview notwithstanding the fact that her work experience was unchanged.

¶ 217        Such a conclusion as to Hunt's potential, had the District made it, would have been entirely reasonable. Hunt had performed every nursing role at the District, suggesting she understood which competencies and procedures were required to adequately perform the responsibilities of those roles. Hunt also had management experience at the District, serving as the interim director of nursing not once but twice. (We note that, in that interim position, Hunt never performed the critical policy development and evaluation duties needed for the nursing services manager position.) And Hunt's employment history demonstrated that she had started, continued, or participated in many different service programs—oriented toward educating and providing other services to the public—that required her to coordinate with various divisions of the District, other

public health agencies, and community entities, like hospitals and schools.

¶ 218 Based on the foregoing, a reasonable person could conclude that Hunt would be able to apply that knowledge in a new way (for her) to satisfy the duties of the nursing services manager. But the District was not required to make that conclusion and select Hunt over a candidate who not only had the necessary knowledge but also had the actual, real-world experience of performing the duties the District required. "Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine*, 450 U.S. at 259.

¶ 219 (a) Education

¶ 220 The Commission concluded that Hunt "achieved great academic success by earning *** her bachelor's degree in nursing in 1998, and a master's degree in public administration in 2002." However, Link had both a bachelor's *and* master's degree in nursing, as well as a Ph.D. in "Educational Leadership, Administration, and Foundations." Perry had also earned a bachelor's degree in nursing in 1995. Although Perry did not have a master's degree, the Commission did not explain, and the record does not show, how Hunt's master's degree was relevant to the nursing services manager position.

¶ 221 (b) Prior Relevant Experience

¶ 222 The District needed a head of nursing who could develop standards for the nurses in all the District's divisions and then implement those standards through training and competency evaluations. Link had many years of experience educating, training, and evaluating clinical nurses at colleges and universities in addition to clinical settings. Link's diverse clinical background in obstetrics, neonatal care, dentistry, mental health, and primary care was far greater than Hunt's experience performing public health clinical work but not supervising that work. Perry similarly

had a broad clinical background, and Perry had over 15 years of training and supervising nurses in emergency departments. Critically, both Link and Perry wrote protocols, trained nursing staff, and evaluated that staff for competency.

¶ 223       Contrary to the State's claims, Hunt was not performing these functions when she was the interim director of nursing. Indeed, Meline, Pryde, and Rogers testified that the primary reason the District needed to create the nursing services manager position was because it did not have (1) agency-wide procedures for periodic competency evaluation or (2) standard operating procedures for all clinical nursing functions.

¶ 224                          (c) Interview Performance

¶ 225       Federal law suggests that plaintiffs in a failure to promote case face a major hurdle when the legitimate nondiscriminatory purpose was based on qualifications. For instance, the Seventh Circuit has held that "where a plaintiff in a promotional denial case relies solely upon a gap in credentials between himself and the successful candidates, the gap must be so substantial [as to] slap you in the face." (Internal quotation marks omitted.) *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 562 (7th Cir. 2004). "Evidence of [the plaintiff's] qualifications only would serve as evidence of pretext if the differences between her and [the hired candidate] were so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." (Internal quotation marks omitted.) *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009). "If the employer honestly believed the reason it proffers for its employment decision [(hiring the most qualified candidate)], the reason is not pretextual." *Scruggs*, 587 F.3d at 839.

¶ 226       Under any of these standards, Hunt's claim clearly fails, but we need not adopt these standards to resolve this case. Even under the standard set by this court in *Stone*, if the

candidates are equally qualified, the employer is not required to hire the protected class member; " '[r]ather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.' " *Stone*, 299 Ill. App. 3d at 315 (quoting *Burdine*, 450 U.S. at 259).

¶ 227　　　　Here, at most, the argument can be made that Hunt was equally qualified as Link and Perry for the nursing services manager position. Even making that assumption, Hunt failed to show that the District's reasoning was a pretext for racial discrimination. Nothing in the record suggests racial animosity, particularly because Rodgers described Palazzolo as having animosity towards several white nurses, in addition to Hunt, that he wanted to see fired (although they never were). Every witness to testify at the hearing said race was not discussed, considered, or a factor in the hiring process. Hunt was the only one who expressed her belief that she did not get the job because she was Black. But Hunt could not support this with any evidence other than her *prima facie* case. Because the District's nondiscriminatory reason was legitimate, and because Hunt could not show that she was more qualified than the other applicants, no reasonable person, after considering this record, could properly conclude that she did not get promoted, in part, because of race discrimination. In short, even viewing all of the evidence in the light most favorable to her, Hunt failed to prove by a preponderance of the evidence that she was not promoted because of her race.

¶ 228　　　　We conclude that the Commission's finding that Hunt was the most qualified applicant was against the manifest weight of the evidence. Accordingly, she was not entitled to a liability finding, and we reverse the Commission's finding on that claim.

¶ 229　　　　　　　　　　　　　　ii. *Public Health Nurse II*

¶ 230　　　　Regarding the APORS nurse position, Hunt clearly failed to demonstrate that she

was *more* qualified than those hired. At most, the evidence shows she was *equally* qualified. Hunt had three years of experience working as a case manager in HealthWorks, which included APORS, and had the requisite certification. Weise had 19 years' experience in the clinical setting dealing with neonatal and postpartum care. Taylor in particular had the most diverse and recent experience. She both worked in the hospital setting and, most recently, was employed by the District as a pediatric nurse who sometimes performed home visits. Ito stated that clinical practice was the only way to gain the acute care experience necessary to be fully prepared for APORS. Public health work alone was not enough.

¶ 231　　Even viewing the evidence in the light most favorable to Hunt, the record at most shows that she was just as qualified as Weise and Taylor for the job. But the employer still has discretion to choose among equally qualified candidates, so long as the decision is not based on unlawful criteria. Hunt had no evidence to support her claim that race was a factor in the District's decision. Each of the interviewers stated that race was not a factor and was not discussed. Hunt was never fired or demoted by Palazzolo despite some evidence that he had animus for her, but none of that evidence suggested the animus was based on race.

¶ 232　　　　　　　　　　　　　IV. CONCLUSION

¶ 233　　For the reasons stated, we affirm the Commission's order in case No. 4-20-0357 and reverse the Commission's order in case No. 4-20-0358.

¶ 234　　No. 4-20-0357, Affirmed.

¶ 235　　No. 4-20-0358, Reversed.

**No. 4-20-0357**

| | |
|---|---|
| **Cite as:** | *Champaign-Urbana Public Health District v. Illinois Human Rights Comm'n*, 2022 IL App (4th) 200357 |
| **Decision Under Review:** | Petition for review of order of Illinois Human Rights Commission, Nos. 05-SF-2282, 07-SF-1305. |
| **Attorneys for Appellant:** | Ruth E. Wyman, of Ruth E. Wyman Law Office LLC, of Urbana, for petitioner. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and David E. Neumeister, Assistant Attorney General, of counsel), for respondents Illinois Human Rights Commission and Department of Human Rights.<br><br>Donald R. Jackson, of Peoria, for other respondent. |